572 A.2d 510

**Robert E. HOLLOWAY**

v.

**FAW, CASSON & CO.**

No. 44, Sept. Term, 1989.

Court of Appeals of Maryland.

April 18, 1990.

John B. Robins, IV and Leonard Bruce Wade (Robins & Johnson, on brief), Salisbury, for petitioner and cross-respondent.

Sally D. Adkins (Fletcher P. Thompson, A. Gillis Allen, II, Adkins, Potts & Smethurst, on brief), Salisbury, for respondent and cross-petitioner.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and MARVIN H. SMITH, Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

This is an action for money damages brought by a firm of accountants against a former partner based on breaches of provisions in the written partnership agreement governing voluntary withdrawal. The controversy focuses on the withdrawing partner's promise to pay to the firm, in the event a client of the firm engages the services of the former partner in that person's new practice of public accountancy, an amount equal to the firm's billings to that client for the twelve months preceding that engagement. The former partner principally contends that the provision is an illegal restraint of trade which is totally void. The trial court and the Court of Special Appeals held, *inter alia,* that the five year restriction is void, but that it could be judicially modified to three years and, as modified, enforced. *Holloway v. Faw, Casson & Co.,* 78 Md.App. 205, 552 A.2d 1311 (1989). We shall hold, as hereinafter explained, that the provision is severable on a client by client basis. Hence

we do not reach whether the rule applied by the lower courts is part of Maryland law.

The accounting firm is Faw, Casson & Co. (FC). The withdrawing partner is Robert E. Holloway, C.P.A. (Holloway). The relevant partnership agreement is that effective as of June 1, 1980 (the Agreement). Holloway had been initially employed by FC as a staff accountant upon his graduation from college in 1968. He progressed from junior accountant, to senior accountant, to supervisor, to manager and, in 1979, to partner. Holloway voluntarily withdrew from FC on December 3, 1984. At that time FC maintained offices in Salisbury, Ocean City, Easton and Annapolis, Maryland and in Dover, Wilmington, Georgetown, Milford and Rehobeth, Delaware. Holloway had worked for a number of years out of FC's Ocean City office and was one of the partners in the Salisbury office when he withdrew. Holloway left FC to practice with another public accounting firm, Twilley & Rommel, which was also located in Salisbury within five miles of the FC office there. At the time Holloway mailed his resignation to his FC partners, he also mailed an announcement of his new professional affiliation to FC's clients. At least 171 of them followed him to his new firm. In 1987 Holloway left Twilley & Rommel and formed a new firm, also in Salisbury.

Paragraph XXI of the Agreement, dealing with voluntary withdrawal from the firm, includes provision for a five year payout by FC to a former partner of the latter's capital account. The paragraph also addresses competition between a withdrawing partner and FC:

"Any partner withdrawing from the partnership voluntarily or involuntarily hereby covenants and agrees that he or she will not engage in the general practice of public accountancy or any of its allied branches, either individually or with any other person, firm or corporation, either directly or indirectly, at any place within a forty mile radius of any of our offices for a period of five years from the date of such withdrawal. If within these limits the partner engages in the general practice of public

accountancy or any of its allied branches, either individually or with any other person, firm or corporation, he or she agrees to pay Faw, Casson & Co. or its successor, 100% of the prior year's fee for any clients that were Faw, Casson & Co.'s who engage the services of the withdrawing partner during the five year period. Any amounts due such partner under item XVII shall be forfeited by such partner. However, such forfeited vested amounts will be used to offset payments above. If there is a balance due Faw, Casson & Co. after offsetting of vested amounts, the partner's individual capital account will be used to offset the balance. Any remaining balance will be secured by a note to Faw, Casson & Co. from the partner payable over a three year period."

Paragraph XVII deals with continued income participation (CIP). CIP payments are equal, monthly payments made by FC, without interest, to a terminated partner for a period of ten years following termination. In broad outline computation of one's CIP payment involves several steps. Annually FC determined as to each partner the product of the firm's *gross* professional fees for the year multiplied by that partner's distribution percentage. FC partners earned a "vested" interest in the respective amounts so determined at rates set forth in schedules in the Agreement. Holloway, who had six years service as a partner, had thirty percent of his current CIP vested. For the fiscal year ending May 31, 1984, Holloway's 100% CIP figure was $118,416 and his vested portion was $35,525.

FC filed a complaint in the Circuit Court for Wicomico County against Holloway in February 1986 seeking damages pursuant to Paragraph XXI. No injunctive relief has ever been claimed by FC. Indeed, FC disclaims that it is available under Paragraph XXI. Holloway filed a counterclaim seeking damages for breach of express contract, for breach of quasi-contractual obligations, and for conversion, and seeking a declaratory judgment that Paragraph XXI of the Agreement was invalid.

The circuit court decided the validity of Paragraph XXI on cross motions for partial summary judgment. Before addressing the validity of the paragraph, that court interpreted the Agreement in three aspects. The trial judge read "100% of the prior year's fee for any clients" to refer to the twelve months prior to a client's going with the partner who withdrew. The language "any place within a forty mile radius of any of our offices" was interpreted to apply only to offices in existence at the time a partner withdrew. Further, the court concluded that, although Paragraph XXI contained a covenant against competition, the Agreement limited the remedy to damages calculated as set forth in the Agreement, so that injunctive relief would not be available even if it had been sought by FC.

The court then undertook an analysis of Paragraph XXI under the law applicable to covenants not to compete with an employer, made by an employee, ancillary to an existing employment relationship, and relating to post employment activity by the employee. The trial judge concluded that the covenant was unreasonable in that its terms could include clients who might first become FC clients after Holloway left but who then might decide to engage Holloway. Further, the court thought that three years would be a reasonable duration of the covenant. The court reasoned that

"once the partner ... has been completely away from Faw, Casson for that three year period of time ... any client-accountant relationship I think would clearly have been severed ... and if there were any future contacts between the accountant and client, it would not have been something that was generated by virtue of their employment with Faw, Casson. I believe that it is unreasonable for five years but not as to three."

The circuit court then applied a rule which has been blessed by the legal commentators and applied by some courts. It is described by its proponents as partial enforcement of a restrictive covenant and by its detractors as

judicial rewriting of a contract. The circuit court adjudicated that

"the provisions of Paragraph XXI of [FC's] partnership agreement relating to payments to be made by withdrawing partners who provide services to clients of Faw, Casson & Co. after their withdrawal are declared to be reasonable and valid as a matter of law with respect to the clients of Faw, Casson & Co. who engage their services within three years from the dates of their withdrawals from Faw, Casson & Co."

Trial was had before a jury on December 7 and 8, 1987. FC presented proof in support of damages in the amount of $95,976, including prejudgment interest. FC listed in an exhibit the names and former account numbers of some 171 clients whom FC contended had followed Holloway in his new practice. Next to each name FC set forth the professional fee earned by it for work done for that client in the twelve months preceding December 3, 1984. There was no objection to the period selected for the damage computation which in effect treated each former FC client as having changed accountants on the date Holloway withdrew. These fees totaled $160,194. FC credited Holloway with $37,417, representing Holloway's capital account, and with $35,525, representing Holloway's vested CIP, leaving a balance due of $87,252. Under the Agreement, this balance was payable over three years, in equal annual payments of $29,084, beginning December 3, 1985. FC also claimed $8,724 in interest at the rate of ten percent per year on the deferred installments, for a total claim of $95,976.

In his direct testimony in the defendant's case, Holloway identified the names on FC's damage computation exhibit as "a list of my clients that I was servicing at Faw, Casson." He stated that he did not contest that he has "serviced them at some point in time since [his] departure from Faw, Casson."

Neither party sought, through the proffer of factual evidence, to reopen the interlocutory declaratory judgment on the issue of contract validity. The case was submitted to

the jury on questions of damages and prejudgment interest only. The jury returned a verdict of $75,655.90 in damages and $6,367.59 in prejudgment interest in favor of FC.[1]

Holloway appealed and FC cross appealed to the Court of Special Appeals. In all material respects the Court of Special Appeals, by a divided panel, affirmed the circuit court.[2] The Court of Special Appeals analyzed the validity of the Agreement's Paragraph XXI by relying to a considerable extent on law developed in cases involving covenants not to compete made ancillary to employment. That court applied a rule of reason which weighed the interests of employer, employee and the public. The court concluded that FC had a protectable interest in existing clients, but vis-a-vis Holloway, only as to clients with whom Holloway came in contact. From the standpoint of the effect on Holloway, the court concluded that the covenant was not *per se* invalid, particularly in the form to which the majority of the panel in the Court of Special Appeals intended to modify the covenant as written. Although viewing the issue as a close one, the Court of Special Appeals concluded that the public interest permitted restrictive covenants in the public accountancy profession.

The panel majority held that the fourth and fifth years of the covenant's duration created an invalid restriction, and that the class of clients within the covenant would have to be limited to those with whom Holloway had had direct contact, in order for the restriction to be valid. Under that

---

1. On cross-examination of FC's damage witness, Holloway's counsel developed that the damage computation did not exclude fees for extraordinary services which would not be expected to recur after December 3, 1984. In addition, the credit to Holloway for his capital account did not reflect unrealized appreciation on realty owned by FC, although that adjustment had been made, after negotiation, in favor of one or more other partners who had withdrawn in the past.

2. The mandate of the Court of Special Appeals affirmed in part and reversed in part and remanded for proceedings in accordance with that court's opinion. The reversal concerned Holloway's conversion claim as to which we shall reverse the Court of Special Appeals. *See* Part IV, *infra.*

analysis the provision excluding Holloway from competition in areas within a forty mile radius of any FC office became a limitation on FC's rights. Thus it was unnecessary for the majority to decide the reasonableness of the area encompassed by the restriction. Finally, on the contract construction phase of the case, the Court of Special Appeals concluded that the provision for damages in Paragraph XXI was intended as a substitute for any other remedy, so that injunctive relief would not be available.

The panel majority, after reviewing the principal authorities concerning restrictions against competition which are valid in part and invalid in part, concluded that it should adopt and apply the doctrine of partial enforcement. The majority would enforce the covenant for the three years, as would the circuit court, but only as to clients with whom Holloway had had "direct contact." Chief Judge Gilbert, in dissent, was "unable to accept the proposition that courts should rewrite agreements in order to save the parties from themselves." 78 Md.App. at 251, 552 A.2d at 1334.

The Court of Special Appeals then turned to Holloway's alternative arguments which characterized the damage provisions in Agreement Paragraph XXI as invalid penalties which were not proper liquidated damage provisions. The court held valid the requirement for payment by Holloway, over a three year period, of an amount equal to a client's prior year's fees. This requirement bore a reasonable relation to actual damages, particularly in the light of evidence that substantially the same standard is used for valuing accounting practices when they are bought and sold. Forfeiture of CIP, on the other hand, bore no reasonable relationship to actual damages and was not an enforceable liquidated damage provision. This conclusion did not affect the judgment under review because Holloway's CIP had been offset against the principal amount of his obligation under the "liquidated damage" clause.[3]

---

3. Holloway received, as credit for CIP, a lump sum in the total amount payable in monthly installments over a ten year period.

Holloway petitioned, and FC cross petitioned, for the writ of certiorari which we issued. In combination the certiorari petitions raise ten questions for review. We shall answer them in the course of our discussion, and not by the numbers.

## I.

### A.

The covenants in Paragraph XXI are sufficiently similar to covenants not to compete to invoke, in general, the analysis applied under the law bearing on covenants not to compete. In *Food Fair Stores, Inc. v. Greeley*, 264 Md. 105, 285 A.2d 632 (1972), this Court reasoned that a provision in the corporate pension plan there involved, under which benefits accrued under the plan were forfeited if the employee engaged in a competing business, did not differ from a covenant not to compete. *Greeley* focused on the fact that a total prohibition against competition, enforced by a forfeiture of accrued benefits, subjected the employee to an economic loss designed to deter competition. *See id.* at 116, 285 A.2d at 638; *see also MacIntosh v. Brunswick Corp.*, 241 Md. 24, 30, 215 A.2d 222, 225 (1965) (forfeiture of deferred bonus upon competition with former employer contained in revised bonus plan "constituted an unlawful restriction on the employee to seek similar employment elsewhere"). The one year's fees clause and the forfeiture provision in Holloway's agreement are similarly designed to protect FC from the loss of clients by reducing the economic benefit which a withdrawing partner might otherwise derive from rendering services to former clients of the firm.

Many jurisdictions which have addressed the validity of somewhat comparable damage clauses in employment contracts or partnership agreements analyze the provisions as restrictive covenants. *See, e.g., Olliver/Pilcher Ins., Inc. v.*

---

Arguably, the credit to Holloway could have been only the present value of that stream of payments.

*Daniels,* 148 Ariz. 530, 531–32, 715 P.2d 1218, 1219–20 (1986); *Rhoads v. Clifton, Gunderson & Co.,* 89 Ill.App.3d 751, 44 Ill.Dec. 914, 411 N.E.2d 1380 (1980); *Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 127–28, 317 N.W.2d 900, 903 (1982); *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310 (1979); *McElreath v. Riquelmy,* 444 S.W.2d 853 (Tex.Civ.App.1969); *Foti v. Cook,* 220 Va. 800, 263 S.E.2d 430 (1980); *Perry v. Moran,* 109 Wash.2d 691, 748 P.2d 224 (1987), *modified on other grounds on reconsideration,* 111 Wash.2d 885, 766 P.2d 1096, *cert. denied,* —— U.S. ——, 109 S.Ct. 3228, 106 L.Ed.2d 577 (1989); *Knight, Vale & Gregory v. McDaniel,* 37 Wash.App. 366, 680 P.2d 448, *rev. denied,* 101 Wash.2d 1025 (1984); *see also Follmer, Rudzewicz & Co. v. Kosco,* 420 Mich. 394, 408, 362 N.W.2d 676, 683 (1984) ("whether such an agreement is characterized as in restraint of trade or not, it must be reasonable to be enforced").

### B.

■ The enforceability of a covenant not to compete depends on the facts of a given case. *See Millward v. Gerstung Int'l Sports Educ., Inc.,* 268 Md. 483, 488, 302 A.2d 14, 16 (1973); *Ruhl v. F.A. Bartlett Tree Expert Co.,* 245 Md. 118, 123–24, 225 A.2d 288, 291 (1967). In Maryland, as in most jurisdictions, the general rule

"is that 'restrictive covenants in a contract of employment, by which an employee as a part of his agreement undertakes not to engage in a competing business or vocation with that of his employer on leaving the employment, will be sustained "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." ' "

*Ruhl,* 245 Md. at 123–24, 225 A.2d at 291 (*quoting MacIntosh v. Brunswick Corp.,* 241 Md. at 31, 215 A.2d at 225 (1965)); *see also Becker v. Bailey,* 268 Md. 93, 96, 299 A.2d 835, 838 (1973); *Gill v. Computer Equip. Corp.,* 266 Md.

170, 180, 292 A.2d 54, 59 (1972); *Tuttle v. Riggs–Warfield–Roloson, Inc.,* 251 Md. 45, 49, 246 A.2d 588, 590 (1968); *Silver v. Goldberger,* 231 Md. 1, 6, 188 A.2d 155, 158 (1963).

Persons in business have a protectable interest in preventing an employee from using the contacts established during employment to pirate the employer's customers. *See Millward,* 268 Md. at 489, 302 A.2d at 17; *Becker v. Bailey,* 268 Md. at 97–98, 299 A.2d at 838–39; *Tuttle,* 251 Md. at 49–50, 246 A.2d at 590; *Ruhl,* 245 Md. at 124–25, 225 A.2d at 291–92. Thus in *Silver v. Goldberger,* this Court stated:

> "There is a line of cases which holds that *restraint is justified* if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee. And there is another line of cases which holds that *restraint is not justified* if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor just as the former employer did through having a competent and efficient employee. See 6A Corbin, *Contracts,* § 1394."

231 Md. at 7, 188 A.2d at 158 (footnote omitted) (emphasis in original).

Illustrating the latter is *Budget Rent A Car, Inc. v. Raab,* 268 Md. 478, 302 A.2d 11 (1973) (operation of car rental franchise did not create contact with customers as an integral part of the job). Illustrating the former is *Tuttle v. Riggs–Warfield–Roloson, supra* (insurance agent's former representative enjoined from servicing clients of agent).

The case at hand involves a protectable interest of FC. Holloway was in a position to establish a personal relationship with FC's clients. If Holloway left the firm it could be anticipated that those clients would follow him. That an accounting firm has a legitimate and protectable interest in the ongoing business relationship it has established with its

clients has been recognized in *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 468 (Del.Ch.1977); *Rhoads v. Clifton, Gunderson & Co.*, 89 Ill.App.3d 751, 754, 44 Ill.Dec. 914, 917, 411 N.E.2d 1380, 1383 (1980); *Ebbeskotte v. Tyler*, 127 Ind.App. 433, 440–41, 142 N.E.2d 905, 909 (1957); *Scott v. Gillis*, 197 N.C. 223, 227, 148 S.E. 315, 317 (1929); *McElreath v. Riquelmy*, 444 S.W.2d 853, 856 (Tex.Civ.App.); *Perry v. Moran*, 109 Wash.2d 691, 700, 748 P.2d 224, 229; *Racine v. Bender*, 141 Wash. 606, 252 P. 115 (1927); *Knight, Vale & Gregory v. McDaniel*, 37 Wash.App. 366, 369–70, 680 P.2d 448, 452.

The issues in the present case revolve around whether the protection FC sought exceeds its legitimate interest, imposes too harsh a burden on Holloway or clashes with the public interest.

### C.

■ Holloway "goes for the jugular" by arguing that covenants against competition between accountants should be *per se* unlawful as violative of Maryland public policy. He likens the accountant-client relationship to the lawyer-client relationship and argues that the policy underlying the prohibition against noncompetition agreements between attorneys should be judicially applied to the accounting profession. *See* Maryland Rules of Professional Conduct, Rule 5.6(a). In support, Holloway sees Md.Code (1974, 1989 Repl.Vol.), § 9–110 of the Courts and Judicial Proceedings Article (CJ) as a legislative finding "that the accountant-client relationship is entitled to extraordinary considerations."

There is a fiduciary relationship between accountant and client and that feature distinguishes the accounting profession from a typical commercial business. *See Mailman, Ross, Toyes & Shapiro v. Edelson*, 183 N.J.Super. 434, 443–44, 444 A.2d 75, 80 (1982) *See generally* Pachman, *Accountants and Restrictive Covenants: The Client Com-*

*modity,* 13 Seton Hall L.Rev. 312 (1983). Thus, in *Edelson* the court stated:

> "Accountants are not commercial business people like the salespersons restricted by noncompetition agreements in *Solari* [*Indus., Inc. v. Malady,* 55 N.J. 571, 264 A.2d 53 (1970)] and *Whitmyer* [*Bros., Inc. v. Doyle,* 58 N.J. 25, 274 A.2d 577 (1971)]. Accountants, like doctors and lawyers, are engaged in a profession which necessarily requires clients to reveal personal and confidential information to them in the course of the professional relationship. Like the lawyer-client relationship characterized in *Dwyer* [*v. Jung,* 133 N.J.Super. 343, 336 A.2d 498 (Ch. Div.1975)], the accountant-client relationship is consensual and fiduciary, and the right of the client to repose confidence in the accountant of his or her choice should not readily be circumscribed. It is this distinction between restrictive covenants in a commercial or business setting, where primarily economic interests are at stake, and those binding professionals who depend largely on unconditional confidential relationships to serve their clients satisfactorily, which underscores the greater degree of injury to the public that may occur in the latter instance."

183 N.J.Super. at 443–44, 444 A.2d at 80 (footnote omitted).

As far as we are informed by counsel and as our own research discloses, only *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 685, 406 A.2d 1310, 1313, and *Edelson,* 183 N.J.Super. at 443–44, 444 A.2d at 79–80, have held a restrictive covenant to be unreasonable because it adversely affected the public's ability to choose an accountant. Neither court, however, proposed that restrictive covenants between accountants were *per se* unreasonable.

We recognize that an accountant becomes privy to the confidential details of a client's financial affairs and often guides the client through the complexities of the tax code. Nevertheless, the relationship does not require a judicially adopted ban against an accountant's voluntarily entering into a reasonable agreement restricting access to a given

market. The better argument lies with those courts that reject a *per se* rule. *See Faw, Casson & Co. v. Cranston,* 375 A.2d at 467–68; *Ebbeskotte v. Tyler,* 127 Ind.App. at 440–41, 142 N.E.2d at 909; *Knight, Vale & Gregory v. McDaniel,* 37 Wash.App. at 370–71, 680 P.2d at 452.

In *Faw, Casson & Co. v. Cranston, supra,* the defendant also argued, based on the analogy between accountants and lawyers, that no-compete clauses between accountants were *per se* illegal. The court pointed out that no ethical rule, similar to the one regulating attorneys, banned restrictive covenants in the accounting profession. 375 A.2d at 468. In addition the evidence in that case suggested that non-competition agreements were widely used in the accounting profession.[4] *Id.* The court found that the restrictive covenant represented a legitimate means for protecting the ongoing business of the accounting firm. *See id.*

For like reasons, courts have rejected a *per se* prohibition against noncompetition agreements between physicians. *See, e.g., Karlin v. Weinberg,* 77 N.J. 408, 417–21, 390 A.2d 1161, 1166–68 (1978) (distinguishing between attorneys and physicians). *Warfield v. Booth,* 33 Md. 63 (1870) enforced a covenant which was ancillary to the sale of a medical practice without any issue of *per se* invalidity having been raised. See generally Annot., Validity & Construction of *Contractual Restrictions on Right of Medical Practitioner to Practice, Incident to Employment Agreement,* 62 A.L.R.3d 1014 (1975).

Nothing in CJ § 9–110 suggests that the General Assembly intended a blanket prohibition against noncompetition agreements between accountants. Nor will we fashion one. The rule of reason by which current Maryland common law tests the validity of restrictive covenants considers the

---

**4.** *But see Smith, Batchelder & Rugg v. Foster,* 119 N.H. at 685, 406 A.2d at 1313, where the court stated that evidence in the case suggested that "the American Institute of Certified Public Accountants opposes [restrictive] covenants because it believes that the employee is put at a severe disadvantage."

public interest as a factor. Holloway has not convinced us that, when applied to the accountants' profession, the current rule fails adequately to protect the public.

## D.

By Paragraph XXI Holloway agreed that he "will not engage in the general practice of public accountancy ... at any place within a forty mile radius of any of [FC's] offices for a period of five years from the date of [Holloway's] withdrawal." The Agreement expressly provides two remedies for FC if the noncompetition covenant is breached. First, the competing former partner "agrees to pay [FC] 100% of the prior year's fee for any clients that were [FC's] who engage the services of the withdrawing partner during the five year period." Second, "[a]ny amounts due such partner [in CIP payments] shall be forfeited by such partner." The Agreement further provides that vested CIP will be initially applied toward satisfying an obligation to pay one year's fees, and next the withdrawing partner's capital account will be applied against that obligation. If any balance remains due from the withdrawing partner to FC after application of those credits, the Agreement contemplates that the former partner will execute a note to FC, payable over three years, evidencing that balance.

## 1.

Whether the noncompete covenant, when combined with the CIP forfeiture, is invalid either as a restraint of trade or as a penalty, is immaterial to the outcome of this case. If the covenant, enforced by the forfeiture remedy, is valid, the Agreement dictates that the "forfeited" amount be applied, before applying the withdrawing partner's capital, against the obligation to pay the equivalent of one year's fees per client. Here the jury's verdict quantified that obligation in an amount exceeding the total of Holloway's vested CIP and capital and the CIP was credited against the fee equivalent obligation of Holloway. If the noncompete covenant, enforced by the CIP forfeiture, is invalid, then

Holloway would have a right to be paid his CIP (over ten years, as agreed), unless Holloway were indebted to FC so that FC could set off, against its debt to Holloway, Holloway's debt to FC. Here, per the verdict, Holloway's debt to FC exceeds the total of payments of vested CIP otherwise to be made by FC to Holloway. If the restrictive covenant enforced by forfeiture is invalid, FC still has a right of set off and the result of invalidity in this case is the same as it would be were the restriction, enforced by forfeiture, valid.

### 2.

Our conclusion that the validity *vel non* of the restriction when enforced by CIP forfeiture is immaterial does not deprive Holloway of a weapon which he could use to assault the validity of the restriction when enforced by the fee equivalent payment obligation. This is because the CIP forfeiture provision is a separate, free standing remedy, independent of the fee equivalent provision. Under a strict reading of Paragraph XXI, a partner withdrawing from FC who engages in the general practice of public accountancy within five years in the delineated areas forfeits CIP even if that former partner never renders any service for an FC client. Under a literal reading of Paragraph XXI, FC in that instance could retain CIP but would have no claim for one year's fees of any client because FC would not have lost any client to the withdrawing partner. In other words, the CIP forfeiture provision is severable in the classic sense.

The principal is illustrated by *Tawney v. Mutual Sys. of Md., Inc.*, 186 Md. 508, 47 A.2d 372 (1946). The field of business activity involved in that case was "small" loans, *i.e.*, consumer loans made pursuant to a special statute by regulated lenders who are permitted to charge interest higher than that permitted by the general usury statute. The plaintiff was a small loan company which had been active in areas outside of Baltimore City and which had begun doing business in Baltimore City by acquiring a portfolio of loans from other small loan companies. The defendant managed the plaintiff's Baltimore office pursu-

ant to an agreement which contained various restrictions. Paragraphs (J), (K) and (L) prohibited the defendant from disclosing, or using for competitive purposes, customer information for three years following termination of employment. Paragraph (M) restricted competition "in the Baltimore City trading area" for two years following termination. When the defendant left the plaintiff's employ in order to open his own small loan company, many of the plaintiff's customers refinanced their loans with the defendant. The plaintiff sued for an injunction and an accounting. This Court held that the restriction in paragraph (M) went beyond that necessary to protect the goodwill of the employer and that it worked an undue hardship upon the defendant. The Court also held, however, "that the covenants contained in clauses (J), (K) and (L) of the contracts, are severable and enforceable in terms." 186 Md. at 521, 47 A.2d at 379. The portion of the lower court's decree which had directed an accounting was also approved.

The principle applied in *Tawney* is articulated in § 518 of Restatement, Contracts (1932) which reads:

"When a promise in reasonable restraint of trade in a bargain has added to it a promise in unreasonable restraint, the former promise is enforceable unless the entire agreement is part of a plan to obtain a monopoly; but if full performance of a promise indivisible in terms, would involve unreasonable restraint, the promise is illegal and is not enforceable even for so much of the performance as would be a reasonable restraint."

Like the promises in *Tawney*, the CIP forfeiture provision of the Agreement is divisible in terms from the promise to pay fee equivalents.

Further, because Holloway's vested CIP is totally exhausted when applied as a credit against his fee equivalent obligation, and because we shall in part Part I. E., *infra*, affirm the judgment on the jury's verdict fixing that fee equivalent obligation, a declaratory judgment on the validity of the CIP forfeiture can have no future application between the parties to this litigation. The issue is moot.

#### E.

The noncompete clause, when combined with the fee equivalent remedy, is transformed. No longer is there a complete prohibition against competition. Holloway at any time and at any place may engage "in the general practice of public accountancy or any of its allied branches, either individually or with any other person, firm or corporation" and he may compete against FC for any account, except an FC client, without incurring any fee equivalent obligation. The only relevant consideration, as a practical matter, in applying the fee equivalent remedy is whether a FC client, within five years after Holloway left the firm, engages Holloway to render accounting services. If that occurs, then the Agreement says that Holloway is obliged, in effect, to purchase the account from his former firm.

*Perry v. Moran, supra,* explained the philosophy underlying the type of provision now under consideration.

> " 'The rules of the law that surround restrictive covenants strive to achieve a balance between the rights and duties of contending interests. By restricting the accountant covenantee from rendering professional services to clients of his or her former firm, the court is within the ambit of the traditional rules of restrictive covenant law although there may be some adverse effect on the public; that is, those clients who would prefer to enjoy the continued services of the accountant leaving the firm. That effect, however, is avoided or lessened if instead of granting injunctive relief, the court requires the former employee or partner to pay for the clients "taken." By providing the purchase price and terms in the agreement, the court's task is made easier and the likelihood of enforcement is enhanced. Thus, the legitimate interest of the employer is protected without imposing undue hardship on the employee or being overly injurious to the public.' "

109 Wash.2d at 702, 748 P.2d at 230 (quoting Pachman, *Accountants & Restrictive Covenants, supra,* 13 Seton Hall L.Rev. at 322).

The covenant in *Perry* ran for five years from termination of employment and required the employee to pay fifty percent of the fees charged by the employee to former clients of the employer for three years commencing with the date the employee first rendered services to any of those clients. The court held, inasmuch as only seventeen months had elapsed between termination of employment and trial of the breach of covenant case, it was immaterial whether the five year duration of the covenant was unreasonably long.[5] 109 Wash.2d at 703–04, 748 P.2d at 230–31. A principal part of the court's rationale is found in the following passage:

"One unpleasant alternative for accounting firms and other employers who rely upon covenants not to compete to protect their business, if such covenants are not upheld, is to forever rotate the employees who service clients with other employees, thereby limiting employee client contact as much as possible. Another unattractive alternative is constant management supervision or monitoring of the employee's work so that the client looks always to management rather than the employee for answers. It is readily apparent that forcing such courses of conduct upon an employer is costly, inefficient and would lead to unsatisfactory firm-client relationships. No rule of law should force employers into such actions." 109 Wash.2d at 700–01, 748 P.2d at 229.

We are in substantial agreement with the approach taken in *Perry v. Moran, supra*. The covenant in the Agreement, as limited by the fee equivalent remedy, ties the restriction closely to FC's interest in its client base, inhibits Holloway's practice of accountancy only with respect to that client

---

**5.** On reconsideration, the court found that its determination that the liquidated damages clause was reasonable was premature in light of the fact that the trial court made no determination as to the reasonableness of the clause. 111 Wash.2d 885, 887, 766 P.2d 1096, 1097. The court stated that it "would have no difficulty affirming [the trial court's] decision had the trial court held the clause reasonable." *Id.* at 887, 766 P.2d at 1097. The court affirmed its prior decision in all other respects. *Id.* at 886–87, 766 P.2d at 1096.

base, and gives the general public, outside of that client base, the benefit of unfettered competition. The reasonableness of the provision is further reinforced by its ready analogy to the purchase of an accounting practice, or of part of an accounting practice. In connection with the summary declaratory judgment on the validity issue, FC presented certain deposition testimony and the affidavit of a very experienced accountant with a firm other than FC. That proof, which Holloway did not controvert, was that accounting practices, including two practices acquired by FC, are purchased at prices determined by multiplying annual billings by a factor in a range which comfortably includes the factor, one (1), utilized in the Agreement.

The foregoing considerations have been relied upon by courts in upholding covenants, between accountants, of the type before us. *See Criss v. Davis, Presser & LaFaye*, 494 So.2d 525 (Fla.App.) (non-equity principal agreed to pay equivalent of 150% of firm's prior year's billings), *rev. denied*, 501 So.2d 1281 (Fla.1986); *Rhoads v. Clifton, Gunderson & Co.*, 89 Ill.App.3d 751, 44 Ill.Dec. 914, 411 N.E.2d 1380 (1980) (withdrawing partner to pay lesser of fees charged by firm during twenty-four months preceding withdrawal or of fees charged by withdrawing partner to former firm clients within twenty-four months after withdrawal); *Wolf & Co. v. Waldron*, 51 Ill.App.3d 239, 9 Ill.Dec. 346, 366 N.E.2d 603 (1977) (noncompete covenant limited to former clients of employing firm); *Ebbeskotte v. Tyler*, 127 Ind.App. 433, 142 N.E.2d 905 (1957) (restrictive covenant limited to clients of former employer); *Engel v. Ernst*, 102 Nev. 392, 724 P.2d 215 (1986) (average of firm's annual fees over three years preceding partner's withdrawal); *Foti v. Cook*, 220 Va. 800, 263 S.E.2d 430 (1980) (withdrawing partner to pay one-third of fees collected from former firm clients for a period of three years); *Knight, Vale & Gregory v. McDaniel*, 37 Wash.App. 366, 680 P.2d 448 (payment of thirty-five percent of fees collected by former employee during three year term of covenant), *rev. denied*, 101 Wash.2d 1025 (1984). Indeed some courts do not even

consider covenants of this subject type to be a form of covenant not to compete, so that these covenants are outside of a common law rule or a statute, the object of which is to prohibit restraints of trade. *See Miller v. Williams,* 300 So.2d 752 (Fla.App.1974), *cert. denied,* 314 So.2d 780 (Fla.1975); *Francis v. Schlotfeldt,* 10 Kan.App.2d 517, 704 P.2d 381 (1985); *Winston v. Bourgeois, Bennett, Thokey & Hickey,* 432 So.2d 936 (La.App.1983); *Follmer, Rudzewicz & Co. v. Kosco,* 420 Mich. 394, 362 N.W.2d 676 (1985); *Engel v. Ernst,* 102 Nev. 392, 724 P.2d 215; *Dixon, Odom & Co. v. Sledge,* 59 N.C.App. 280, 296 S.E.2d 512 (1982); *Isler v. Shuck,* 38 Or.App. 233, 589 P.2d 1180 (1979).

There are also decisions holding these covenants to be invalid. They have been held to be too broad because the term, "clients," might include persons who no longer use the firm's services at the time the employee leaves, see *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310 (1979), or because "clients" might include persons who first become clients after the employee leaves, see *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208 (Ind. App.1982). Supporting the view taken by the Court of Special Appeals, some courts have voided a covenant because it was not limited to clients for whom the departing accountant actually rendered services at the firm. *See Singer v. Habif, Arogeti & Wynne, P.C.,* 250 Ga. 376, 297 S.E.2d 473 (1982); *Polly v. Ray D. Hilderman & Co.,* 225 Neb. 662, 407 N.W.2d 751 (1987); *Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 317 N.W.2d 900 (1982). From the standpoint of the money judgment against Holloway, the questions raised by these cases are not presented here. Holloway acknowledged in his testimony that each person as to whom a claim for damages was made against him was a client of FC whom Holloway had served while he was at FC.

Nor does the money judgment in this case rest on any facts which would generate an illegality issue involving the length of time of the covenant's operation. This case was tried to the jury within a few days of the third anniversary

of Holloway's withdrawal. All of the damage evidence presented reflected fees paid by FC clients to FC in the twelve months preceding Holloway's withdrawal. Under the theory on which the damage computation in this case was presented, without objection, the covenant was applied only with respect to clients who left FC when Holloway did. That does not raise any question of unreasonable duration.

■ Holloway further argues that, by restricting him from areas within a forty mile radius of each FC office, the covenant fails because it is unreasonable territorially. This argument overlooks the fact that the fee equivalent remedy does not prohibit him from practicing in the described areas, but merely requires him to compensate FC if he serves its clients. As noted by the Court of Special Appeals, the territorial restriction limits FC's rights. 78 Md.App. at 227, 552 A.2d at 1322.

■ *Tuttle v. Riggs–Warfield–Roloson, Inc.*, 251 Md. 45, 246 A.2d 588 (1968), upheld a covenant prohibiting an insurance agent's representative, for a period of two years after termination, from rendering insurance placement services for customers of the agent. In *Gill v. Computer Equip. Corp.*, 266 Md. 170, 292 A.2d 54 (1972), the covenant prohibited the employee, after termination, from working for, or servicing the products of, customers of the employer's business, that of a manufacturer's representative. This Court, relying on *Tuttle*, rejected an argument that the covenant was invalid because it contained no area limitation. Limiting the restriction to customers of the employer made the clause reasonable. *Id.* at 180–81, 292 A.2d at 59. Here, no geographic limitation is needed because the clause only restricts Holloway's access to FC clients.

In a case involving an accountant's covenant, *Wolf & Co. v. Waldron*, 51 Ill.App.3d 239, 242, 9 Ill.Dec. 346, 348, 366 N.E.2d 603, 605, the court stated:

"Although defendant would prefer to characterize the absence of a geographic restriction as creating a 'nationwide covenant,' we take a different view.

"The purpose of the restrictive covenant was to protect plaintiff from losing its clients to former employees by reason of the familiarity gained with the clients' affairs during the course of employment. A limitation as to geographical location would serve no purpose. Plaintiff had numerous offices throughout the United States, and its clients were similarly doing business on a nation-wide basis. It is apparent that any geographical limitation would prove useless."

Similarly, *McElreath v. Riquelmy*, 444 S.W.2d 853, 856 (Tex.Civ.App.1969), held that a covenant against a withdrawing partner's serving an accounting firm's clients was sufficiently limited without delineating an area. *See also Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 213 (Ind.App.) (citing *Gill v. Computer Equip. Corp.*); *Rhoads v. Clifton, Gunderson & Co.*, 89 Ill.App.3d 751, 755, 44 Ill.Dec. 914, 917, 411 N.E.2d 1380, 1383; *Ebbeskotte v. Tyler*, 127 Ind.App. 433, 441, 142 N.E.2d 905, 909.

Although some courts require a specific territorial limitation in covenants that prohibit an accountant from doing work for the employer's clients, *see Fuller v. Kolb*, 238 Ga. 602, 234 S.E.2d 517 (1977); *Smith, Batchelder & Rugg v. Foster*, 119 N.H. 679, 406 A.2d 1310, we find the reasoning of those cases on this point unpersuasive.

### F.

In addition to defending against FC's claim for damages accrued under the fee equivalent clause of the Agreement, Holloway sought a declaratory judgment that Paragraph XXI was void in its entirety as a restraint of trade. Even though the evidence on which FC's damage claim was actually decided treats the breaches of covenant as having occurred on December 3, 1984, there was a potential liability for additional breaches after that date which Holloway sought to have eliminated by a declaratory judgment adjudicating that the covenant was void and thereby disposing of the entire controversy.

The circuit court declared that the covenant was valid for three years from Holloway's withdrawal, and that feature of the declaratory judgment was affirmed by the Court of Special Appeals. Decision of Holloway's certiorari issues does not require that we resolve whether the covenant became unreasonable at any point in the period after Holloway's withdrawal and before trial, which for simplicity's sake, we shall consider to have been held precisely three years after Holloway's departure. At trial FC had the opportunity to prove which clients switched from FC to Holloway at any time up to trial. The money judgment is therefore *res judicata* as to all claims which FC could have asserted up to trial. Thus, Holloway has no exposure to any liability to FC under the fee equivalent clause for having rendered accounting services to any FC client within the first three years of the covenant's term. Whether the covenant is invalid for unreasonable duration up to three years from Holloway's withdrawal is now moot.

### G.

That portion of the circuit court's declaratory judgment which, favorably to Holloway, invalidated the fourth and fifth years of the five year term specified in the covenant was affirmed by the Court of Special Appeals. It is an issue before us raised by FC's cross petition for certiorari.

Whether the duration of a covenant not to compete is reasonable depends on the facts of a particular case and the interest of the employer sought to be protected.[6] In Annot., *Enforceability of Restrictive Covenant, Ancillary*

---

6. Appellate courts in Maryland have addressed a large number of covenants not to compete and upheld varying temporal restrictions. *See, e.g., Millward v. Gerstung Int'l Sports Educ., Inc.,* 268 Md. 483, 302 A.2d 14 (1973) (two year prohibition against engaging in sports camp business upheld); *Gill v. Computer Equip. Corp.,* 266 Md. 170, 292 A.2d 54 (1972) (two year prohibition against serving customers of division of computer company upheld); *Tuttle v. Riggs–Warfield–Roloson,* 251 Md. 45, 246 A.2d 588 (1968) (two year restriction on employee of insurance general agency upheld); *Ruhl v. F.A. Bartlett Tree Expert Co.,* 245 Md. 118, 225 A.2d 288 (1967) (two year prohibition against competition by area manager of tree care company

*to Employment Contract, As Affected by Duration of Restriction,* 41 A.L.R.2d 15, 72, § 14 (1955), the editor proposed the following summary of the decisions on the subject:

"Under the so-called 'customer-contact' theory, the personal relations established between the employee and his employer's customers are determined by the influence the employee, as a consequence of his position in his employer's business, exerts over the customers. Stated differently, the customer-contact theory considers not so much the mere opportunity of the employee to become acquainted with the customers of his employer as a determining factor in the employer's need for protection, but rather takes the personal relationship existing between employee and customer into account, that is, whether or not the personal contact is so strong as to enable the employee to control, in whole or in part, the business of the customer as a personal asset so that the likelihood exists that the employee, when leaving the employer's service, might be able to take the customers with him."

The editor continues at 72–73:

"If a general observation which cannot be strictly supported by authority is permissible, the length of time

---

upheld); *Western Maryland Dairy, Inc. v. Chenowith,* 180 Md. 236, 23 A.2d 660 (1942) (six month restriction on milk route salesperson held reasonable); *Griffin v. Guy,* 172 Md. 510, 192 A. 359 (1937) (restrictive covenant between barbers upheld although unlimited as to time); *Tolman Laundry, Inc. v. Walker,* 171 Md. 7, 187 A. 836 (1936) (one year restriction on employee of laundry business upheld); *Anderson v. Truitt,* 158 Md. 193, 148 A. 223 (1930) (sale of furniture business with twenty-five year restriction on competition held reasonable); *Deuerling v. City Baking Co.,* 155 Md. 280, 141 A. 542 (1928) (three month restriction on employee of bakery upheld); *Geurand v. Dandelet,* 32 Md. 561 (1870) (sale of dyeing and scouring establishment and lease of premises which prevented seller, lessor from competing upheld although unlimited as to time). *Cf. Food Fair Stores, Inc. v. Greeley,* 264 Md. 105, 285 A.2d 632 (1972) (forfeiture clause in employee pension plan prohibiting competition was unreasonable because it contained no limitation as to area or duration); *Tawney v. Mutual Sys. of Md.,* 186 Md. 508, 47 A.2d 372 (1946) (two year prohibition on competition by small loan manager held unreasonable).

considered necessary for the protection of the employer's interest under the customer-contact theory—and therefore the permissible duration of the restraint—seems to depend on the period of time which, in the opinion of the courts, is required to obliterate in the minds of the customers the identification formed during the term of employment between the employer's business and the employee dealing with the customer. Stated differently, the question is: After what period of time will the customer cease to be influenced by the personal relationship the employee was able to establish while in the employ of his employer? While the answer to this question obviously depends on the individual circumstances of each case, the key factor in all these cases seems to be the frequency and regularity of the contact between employee and customer."

Restraints of five years or greater that prohibited an accountant from competing with a former employer were sustained in *Fuller v. Brough,* 159 Colo. 147, 411 P.2d 18 (1966) (en banc) and in *Ebbeskotte v. Tyler,* 127 Ind.App. 433, 142 N.E.2d 905. A five year prohibition in a no compete clause containing a damage remedy based on fees was upheld in *Rhoads v. Clifton, Gunderson & Co.,* 89 Ill.App.3d 751, 44 Ill.Dec. 914, 411 N.E.2d 1380.

 Despite the foregoing holdings, a five year period appears longer than needed to protect FC's relationship with its clients. "[F]or the covenant to be reasonable, this Court must be convinced that [FC] needs 5 years to reestablish client trust." *Perry v. Moran,* 109 Wash.2d at 708, 748 P.2d at 233 (Utter, J., dissenting). In *Tawney, supra,* this Court refused to enforce a two year prohibition against competition contained in a small loan manager's employment contract, because it "sought to enforce a restriction beyond the time when new employees might reasonably become acquainted with existing customers[.]" 186 Md. at 521, 47 A.2d at 379. Under the reasoning of *Tawney,* FC is only entitled to a reasonable length of time to enable a new accountant to learn the business of the clients previously

served by Holloway and to demonstrate the capacity to handle the clients' business in a competent manner.

Persons, whether natural or corporate, who engage the services of accountants on a regular basis necessarily deal with the accountant at least annually. This contact may be for the preparation of a given year's financial statements, whether audited or unaudited, and will be for the preparation of income tax returns. We also recognize that an accounting firm employer, when drafting a restrictive covenant, cannot know precisely when in the course of a year any given employee will give notice of an intent to terminate the relationship or how the timing of that notice will relate to the needs for accounting services of particular clients. The period of three years from termination selected by the trial court gives the accounting firm an opportunity during two and possibly three seasons of contact with a client to establish and reinforce a professional relationship through a substitute accountant. We agree with the Court of Special Appeals when it observed that, if, in order to engage Holloway, a client left FC more than three years after Holloway's departure "it would surely not be as a result of any personal relationship forged with Holloway while the [latter] was employed by Faw, Casson; rather, it would be due to Holloway's competitive efficiency and that efficiency is not a legitimate target for a restrictive covenant." 78 Md.App. at 221, 552 A.2d at 1319. We hold that the Court of Special Appeals did not err by failing to allow more than three years.

### H.

The essence of Holloway's argument is that this Court should not look at the actual evidence but that we should consider the extravagances of enforcement that could hypothetically fall within the language of the covenant. We are urged not to be concerned with that which is, or was, but only with that which might be. That general mode of analysis in noncompete covenant cases was acknowledged by the Court of Special Appeals in its *Holloway* opinion.

"Faw, Casson does not dispute, or could they properly do so, Holloway's contention that it is sufficient that unreasonable restraints are available in an agreement and the employer need not actually seek unreasonable relief in order for the courts to strike down the potentially unreasonable part of a restrictive covenant."

78 Md.App. at 227, 552 A.2d at 1322. In a supporting footnote the Court of Special Appeals cited *Millward v. Gerstung Int'l Sports Educ., Inc.*, 268 Md. at 488, 302 A.2d at 16, where we said that "a determination of enforceability should be made based on the scope of each particular covenant itself, and, if that, on its face, is not too broad, the facts and circumstances of each case must be examined." The implication is that, conversely, if the covenant is too broad on its face, there is no necessity to examine the factual circumstances because the covenant is void. There would appear to be merit to that analysis in a case in which a prohibitory injunction, coterminous with the scope of a covenant against competition, is the relief sought, as was the situation in *Millward*. Requesting an injunction against breaching the covenant as drawn puts in issue the reasonableness of the entire covenant. Likewise, it would seem that, when equitable relief is requested, the court has discretion to refuse to craft an injunction which reaches beyond restraints which the court considers to be reasonable. The chancellor's foot need not stride to the farthest limits embraced by a covenant's language, even if the court is asked to do so. In this sense, a court exercising equitable powers would be partially enforcing the restrictive covenant. That is not, however, the sense in which the Court of Special Appeals partially enforced the covenant in the present case.

After analyzing *Hebb v. Stump, Harvey & Cook, Inc.*, 25 Md.App. 478, 334 A.2d 563, *cert. denied*, 275 Md. 749 (1975) as a case involving textual severability (a so-called "blue pencil" excision of the invalid language) combined with a strict interpretation of vague language, the intermediate appellate court in its *Holloway* opinion said that "[t]here

was no need for the [*Hebb*] court to actually alter the *express* language of the agreement as was done [by the circuit court] in the case *sub judice.*" 78 Md.App. at 232, 552 A.2d at 1325 (emphasis in original). The court cited the endorsement of partial enforcement in 14 S. Williston, *A Treatise on the Law of Contracts* § 1647C, at 297 (3d ed. 1972), in 6A A. Corbin, *Contracts* § 1390, at 70–71 (1962), and in Restatement (Second) of Contracts § 184 comment b, illustration 2 (1979), as well as the rule's application in a number of cases including *Solari Indus., Inc. v. Malady,* 55 N.J. 571, 264 A.2d 53 (1970). The panel majority in the Court of Special Appeals then concluded "that the circuit court did not err in its reduction of the number of years in the restrictive covenant from five down to a number of reasonable duration." 78 Md.App. at 239, 552 A.2d at 1328.

The provocative questions concerning judicial power raised by the majority of the panel and spotlighted by Chief Judge Gilbert's dissent can be resolved another day in some other case. A court does not reach the question of partial enforcement, in the sense in which the panel majority used and applied it, if the invalidity is severable. In the case at hand the covenant is severable on a client by client basis.

FC's action joins 171 claims of breach of covenant. Holloway, as we have seen, did not breach the subject covenant by opening an office for the practice of public accountancy. Nor did he breach the covenant by competing with FC for the custom of persons who were not clients of FC. Thus, this is not a case in which Holloway committed a single breach of covenant for which the damages would mount depending upon the number of former FC clients who engaged Holloway. Rather, the first of a series of breaches occurred when Holloway accepted the first former FC client as his own and the damages for that breach are measured by the fees which that client paid to FC in the preceding twelve months.

Thus, we did not avoid the thrust of Holloway's argument in Part I. E., *supra,* when we pointed out that this case did not present claims for fee equivalents for clients whom

Holloway had never served at FC. If FC had claimed a breach of the covenant because Holloway in his new practice served a former FC client whom Holloway had never served at FC, and if the Court of Special Appeals is correct that application of the covenant in that instance would be an illegal restraint of trade, then that claim could be denied for invalidity without affecting the application of the covenant to claims for legally enforceable breaches.

## II.

Holloway also contends that the fee equivalent and CIP forfeiture provisions are unenforceable penalties. It is immaterial whether the CIP forfeiture is unenforceable as a penalty, for the same reasons given in Part I. D., as to the immateriality of its possible invalidity on restraint of trade grounds. With respect to the fee equivalent formula, the essence of Holloway's argument is that it bears no relationship to actual damages.

The test for the validity of a liquidated damage clause is set forth in *Massachusetts Indem. & Life Ins. Co. v. Dresser*, 269 Md. 364, 368–69, 306 A.2d 213, 216 (1973):

"First, such a clause must provide 'in clear and unambiguous terms' for 'a certain sum,' *Siler v. Marshall*, 251 Md. 342, 346, 247 A.2d 385, 387–88 (1968).... Secondly, the liquidated damages must reasonably be compensation for the damages anticipated by the breach.... Thirdly, liquidated damage clauses are by their nature mandatory binding agreements before the fact which may not be altered to correspond to actual damages determined after the fact...."

Here, "the prior year's fee for any clients" (Agreement Paragraph XXI) can be calculated with reasonable certainty as a specific sum. Next, from the premise that FC has a contractually protectable interest in its client base, it follows that economic loss to FC from breach of a contract protecting that interest might take two forms. The firm can suffer loss of the contribution from the departing

clients' gross fees toward the fixed overhead of the firm. *See David Sloane, Inc. v. Stanley G. House & Assocs., Inc.,* 311 Md. 36, 532 A.2d 694 (1987). Moreover, the firm's net profit could be reduced, thus reducing the amount available for distribution to partners. Losses of both types continue year after year for every year in which the departing client would otherwise have remained a FC client. The dollar amount of the actual losses of these types is very difficult to prove with reasonable certainty. One way to quantify, in specific dollars, these ongoing economic losses is to answer the question, "What is the value of the client to the accounting firm?" The evidence in this record is that the Agreement answered that question by incorporating into the liquidated damage clause the basis on which accounting practices are bought and sold.

In addressing in Part I. E., *supra,* Holloway's restraint of trade attack on the fee equivalent provision, we cited and briefly described a number of decisions which have sustained the subject type of provision. Some of these decisions, employing substantially the rationale set forth above, have rejected attacks which were based on the penalty argument. *See Criss v. Davis, Presser & LaFaye,* 494 So.2d 525 (Fla.App.); *Engel v. Ernst,* 102 Nev. 392, 724 P.2d 215; *Knight, Vale & Gregory v. McDaniel,* 37 Wash. App. 366, 680 P.2d 448. *See also Isler v. Schuck,* 38 Or.App. 233, 589 P.2d 1180. Other courts have upheld the enforceability of these clauses without even addressing whether the clause was a penalty. *See, e.g., Foti v. Cook,* 220 Va. 800, 263 S.E.2d 430; *Dobbins, Dequire & Tucker v. Rutherford, MacDonald & Olson,* 218 Mont. 392, 708 P.2d 577 (1985). Reaching contrary results, but with respect to clauses using a higher effective multiplier of earnings, are *Cherry, Bekaert & Holland v. LaSalle,* 413 So.2d 436 (Fla.App.1982) (two times employer's prior year's fees obtained from client); *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208 (Ind.App.1982) (three times gross annual billings to client) and *Smith, Batchelder & Rugg v. Foster,* 119

N.H. 679, 406 A.2d 1310 (fifty percent of fees for three years after termination).

We hold that the fee equivalent provision is a valid liquidated damage clause.

### III.

Holloway submits that FC materially breached the Agreement with respect to his compensation so that he is excused from performing his Paragraph XXI obligations. The issue has been decided against Holloway at every level to date. We shall not break the pattern.

In the fundamental model of a general partnership there is an annual distribution of profits to partners against which is credited the amount advanced as a loan by the firm to a particular partner, *i.e.,* the partner's draw, during the year for which distribution is made. In FC there were controls on the amount of a partner's advance and there were special features in the Agreement designed to level out the repercussions of the loan theory, in particular with respect to junior partners, in the event of a bad year. The Agreement called this modified form of advance or draw a "salary allowance."

Paragraph XI A.1 of the Agreement provided as follows: "Partners shall be paid annual salaries which shall be established by the Executive Committee at the start of each fiscal year. Such salaries may be adjusted upward or downward by the Executive Committee throughout the year. This is the base salary."

The firm operates on a fiscal year of June 1 through May 30. For a number of fiscal years prior to the fall of 1983, the Salisbury office of FC had not produced the amount of fees which had been budgeted for that office under an internal forecasting system.

In the fall of 1983 the Executive Committee decided that the salary allowances of the partners in the Salisbury office would be adjusted to the extent that the actual Salisbury office profits for FY 1984 fell below $150,000. The Execu-

tive Committee further decided that any shortfall would be allocated by the Salisbury partners among themselves, subject to Executive Committee approval. Holloway protested this decision and caused it to be reviewed under FC's salary grievance procedure. A committee of three persons convened on January 25, 1984, to review Holloway's grievance. By a split decision that committee concluded, *inter alia*, as follows:

> "The right of the Executive Committee to re-evaluate the salaries of all partners in an office as a group, while not specifically provided in the Partnership Agreement, does not appear inconsistent with our normal, annual salary setting practices whereby the separate office budgets are used to evaluate the over-all level of partners salaries within an office."

The record in the case now before us is silent as to the adverse effect, if any, which the Executive Committee's salary adjustment actually had on Holloway's earnings from the firm for fiscal 1984.

When this case was tried, the circuit court, finding legally insufficient evidence of any breach by FC, granted a motion for judgment in favor of FC on the alleged breach of contract at the end of Holloway's case as defendant and counterclaimant. The Court of Special Appeals affirmed because Holloway did not prove a material breach of the contract. 78 Md.App. at 243–46, 552 A.2d at 1310–31.

There is no evidence that Holloway suffered any loss as a result of the interpretation and application of the Agreement made by the Executive Committee. Judgment in favor of FC on the breach of contract claim against it was properly affirmed.[7]

---

**7.** Holloway's point is that the Executive Committee did not have the power, under a proper interpretation of the Agreement, to require ultimate adjustment of salary or distribution to be decided among the partners in a particular profit center. To the extent that Holloway's certiorari petition seeks to have this Court determine that the Executive Committee of his former firm violated the Agreement, as construed by us, so that the firm therefore would be liable to him for, at

Holloway asserts that his breach of contract claim cannot be dispatched for a want of proof of damages. He says he "was precluded from offering evidence of damages because the trial court severed the issue of damages in [Holloway's] counterclaim." Brief of Petitioner at 30. For support, Holloway refers to the docket entries of October 2, 1987, the date on which the trial court ruled on both parties' motions for partial summary judgment. The entry reads, in relevant part:

"Court grants Plaintiff's motion for partial summary judgment * * * limits the 5 year from withdraw provision to 3 years ... and severs the issue of damages, as to Defendant's, Holloway, counterclaim for trial December 7, 1987."

The entry makes clear that the summary judgment ruling did not rule on counterclaim damages. It was during the trial which began December 7 that Holloway failed to prove any damages from the salary adjustment.[8]

## IV.

The Court of Special Appeals held that the circuit court had erred in granting a motion for judgment at the end of Holloway's case, as defendant and counterclaimant, on Holloway's claim for conversion. The intermediate appellate court reasoned that, at that stage of the case, the gross

---

least, nominal damages, the grant of certiorari is dismissed as having been improvidently granted.

FC's certiorari petition seeks review of the determination by the Court of Special Appeals that the Agreement was breached by the Executive Committee even though that court further held that Holloway had not proved the breach was a material one. To the extent that FC's certiorari petition embraces the foregoing issue, the grant of certiorari is dismissed as having been improvidently granted.

**8.** One interpretation of the colloquy at the October 2 hearing which led to the "severs ... for trial December 7" docket entry is that it relates to an aspect of Holloway's counterclaim other than breach by way of the salary adjustment. It seems to relate to another contention, not embraced in Holloway's certiorari petition, that Holloway had an interest in FC, following voluntary termination, which was additional to payment of his capital account and of vested CIP.

amount which Holloway owed FC under the fee equivalent provision was in dispute so that, depending upon the jury's finding, the undisputed $37,417 balance in Holloway's capital account might exceed the amount which the jury would find due by Holloway. For this reason the Court of Special Appeals mandated a remand. 78 Md.App. at 247–48, 552 A.2d at 1332. The court also observed that "[i]f on remand it develops that in fact an undisputed portion of Holloway's debt to the firm ... exceeds the amount in his capital account then the trial court on remand will be justified in granting a motion by [FC] for judgment on this issue." *Id.* at 248 n. 13, 552 A.2d at 1332 n. 13.

The error, if any, in granting a motion for judgment on this issue is harmless in light of the jury verdict which has not been challenged. The trial court instructed the jury as follows:

> "I have determined as a matter of law that the defendant Holloway is liable to Faw, Casson for 100 percent of Faw, Casson's prior year's fees for any clients that were Faw, Casson's who have engaged the professional accounting services of Holloway since he left Faw, Casson, less his capital account and his vested continuing income participation account. You need only decide the amount of damages to which Holloway is liable under that instruction."

"[U]nder that instruction" the jury found damages in the amount of $75,655.90. Any error is cured. There is nothing to do on a remand.[9]

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS FOR THE ENTRY OF A JUDGMENT MODIFYING THE JUDGMENT OF THE CIRCUIT COURT FOR

---

**9.** Holloway briefed an argument concerning prejudgment interest to which FC's brief responded. Neither of the petitions for certiorari presented as a question for review an issue concerning prejudgment interest. The matter is not before us.

WICOMICO COUNTY TO CONFORM TO THE OPINION OF THIS COURT AND AFFIRMING, AS SO MODIFIED, THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY ROBERT E. HOLLOWAY.