## MACINTOSH *v.* BRUNSWICK CORPORATION

[No. 479, September Term, 1964.]

*Decided December 20, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, OPPENHEIMER and McWILLIAMS, JJ.

*Frank W. Wilson,* with whom were *Wheeler, Moore & Korpeck* on the brief, for appellant.

*Plummer M. Shearin* and *Patrick C. McKeever,* with whom were *Shearin, McKeever & Fitzpatrick* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

This is an appeal by Francis J. MacIntosh (plaintiff-appellant or employee) from a lower court judgment granting a motion for a directed verdict made by Brunswick Corporation (defendant-appellee or employer) at the conclusion of the plaintiff's case. Two questions are presented by the appeal: (i) whether the lower court erred in not granting a motion for summary judgment and (ii) whether the post-employment restraints proposed by the employer as a part of the employment contract were valid and enforceable against the employee.

(i)

As to the first question, which is relatively easy to determine, it seems to us that the lower court committed error in not granting one of the motions for summary judgment. The fact that the parties filed cross-motions for summary judgment clearly indicates that they did not believe there was a genuine dispute between them as to any material fact. That this was so is also supported by the fact that on appeal both contend that a sum-

mary judgment should have been rendered, albeit each asserts that the motion should have been granted in his (its) favor. That there was no genuine dispute was further evidenced by the fact that the lower court judge directed a verdict in favor of the defendant at the conclusion of the plaintiff's case—thereby taking the factual determination of the case away from the jury. Finally, as a review of the records shows, it is obvious that the lower court should have entered judgment as a matter of law on the pleadings, the supporting and opposing affidavits and the exhibits pursuant to Maryland Rule 610 d.

(ii)

The remaining problem as to which party was entitled to summary judgment poses the major question of whether the proposed post-employment restraints were valid and enforceable against the employee. While the decision of the question is a matter of law, a determination of it necessitates an understanding of the factual situation out of which the controversy arose.

In 1946, the plaintiff-appellant entered into the employment of the defendant-appellee—a manufacturer of recreation equipment doing a nation-wide business—as a counter salesman and, pursuant to an oral employment contract, received a straight weekly salary. He was subsequently promoted to a regular sales position in 1948 and came under a "salary and bonus" pay arrangement by which he received a straight base salary and, in addition, incentive or "bonus" compensation computed on the aggregate amount of sales in excess of a stipulated quota based on the volume of sales necessary to cover basic selling costs. The payment of bonus compensation was made once each year as soon as possible after the end of the year in which the bonus had been earned. During the period of his employment, the employee served in several different sales positions but continued to be paid under basically the same "salary and bonus" plan until shortly before he was discharged by the employer.

In April of 1960 the plan was revised by the employer to the extent that (at the beginning of the year following the one in which the bonus had been earned) a salesman would receive only a portion of the bonus. This portion was the equivalent of

the total salary earned during the previous year. And the balance was payable in five equal yearly installments beginning three years from the date of the original payment on account thereof: as a result the bonus would not be fully paid for eight years. The revision also provided that "should the salesman engage in an occupation or perform an act or acts derogatory to the best interests of [the employer], the salesman * * * [would] lose all rights to future payments whether or not payments [had] commenced previously." Although this revised plan was issued "4-14-60," it was not stated when it would become effective and there is nothing in the record to indicate that the employer ever made any effort to implement it.

Subsequent to the revision in April of 1960, the employer issued another revision specifically concerning bonus payments to sales engineers—the classification of the job held by the employee at that time—which became effective on January 1, 1961. Its provisions were similar to the April revision except that the payment of the balance of the deferred bonus began, one year, instead of three, from the date of the payment of the nondeferred portion of the bonus. As in the prior revision, the balance was to be paid in five equal yearly installments. The employer concedes, however, that the record does not show that the employee was notified of either of these revisions until March of 1961. And the employee specifically denies having any knowledge thereof until that date.

In 1959, the employee had received a salary of $6,900.00 and in March of 1960 was paid the entire bonus of $14,237.76 he had earned for the year 1959 on sales exceeding his quota. In 1960, he again received a salary of $6,900.00 but, instead of being paid his entire bonus of $17,509.27 for that year as had been the practice in prior years, he received only an additional $6,900.00. This portion of the 1960 bonus was received on March 14, 1961, along with a letter from the employer explaining that the balance of the bonus, amounting to $10,609.27, was being withheld and deferred to be paid over the succeeding five years in equal installments. The letter further stated that—

"In the event you, either during or after your employment by the Company [the employer] shall wilfully perform any act contrary to the welfare [or] best

interest of the Company, you * * * shall lose all rights to future bonus payments, regardless of the fact that payments have previously commenced. Without limiting the generality of the aforegoing, the following acts shall result in the loss of rights to such future bonus payments:

* * *

(d) Engaging directly or indirectly in any business activity substantially competitive with the business of the Company.

* * *

Please sign one of the two copies of this letter, signifying receipt, and return it immediately to * * * the Home Office."

The employee thereafter discussed the letter and the effect of the deferred bonus payments with his immediate supervisor and agreed to sign the letter as requested.

On March 15, 1962, the employee received his first one-fifth payment on the balance of his 1960 bonus in the sum of $2,121.-87. On August 31, 1962, he was dismissed from his employment by the employer in order to effect a reduction of its sales force. As of that time there remained in his deferred bonus account the sum of $8,487.40. At the time of his dismissal, the employee discussed with his supervisor the payment of the balance of the bonus due him. He was told that he would receive the balance immediately and that he (the supervisor) would make arrangements to that end. But on October 1, 1962, the employee received a letter from the employer informing him that the remainder in his bonus account would be paid in yearly installments in accordance with company policy.

MacIntosh later accepted a position with the Bowl-Mor Company, a manufacturer of duckpin, candlepin, ninepin and tenpin pin-setters, which, insofar as the manufacture of tenpin pin-setters was concerned, was a competitor of Brunswick. On October 12, 1962, the former employee informed his former employer of his action by letter. Thereupon, Brunswick, having ascertained after the receipt of the letter that MacIntosh, as a salesman of tenpin pin-setters, was competing with it in "the State of Virginia and elsewhere," concluded that its former em-

ployee had wilfully performed acts "contrary to its welfare [and] best interests" and declared that the $8,487.40 of deferred compensation due MacIntosh was forfeited.

Contrary to the assertion made by Brunswick on this appeal that the "bonus" in question was a gratuity, the payment of which could not be enforced against it because the payment thereof was not based on a valuable consideration, we think the so-called bonus was essentially earned compensation for services rendered by MacIntosh for which he was entitled to recover. Cf. *Johnson v. Schenley Distillers Corp.*, 181 Md. 31, 28 A. 2d 606 (1942). Ordinarily, a "gratuity" is that which is voluntarily given in return for a service. And a "bonus" is that which is given, though not strictly due, as additional compensation to the recipient of a fixed salary. On the other hand, "earned compensation" is generally considered to be that which constitutes, or is regarded as, the equivalent of the work or service one actually does or performs for another. Applying the last definition to the factual situation in this case, where the salary as well as the additional compensation was fixed, or by a simple calculation was readily ascertainable, it is apparent that both had been earned in accordance with the terms of the oral employment contract then in effect. Specifically, the record shows that the bonus in question was earned in 1960 pursuant to the original oral contract of employment which had imposed no conditions as to the time of payment. Furthermore, since the employee was not notified of the revisions made in the original "salary and bonus" pay arrangement until March 14, 1961, such post-employment provisions were not enforceable against the employee as to the bonus which had been previously earned.

Regardless, however, of whether the bonus had been earned in 1960 pursuant to the original oral employment contract, or whether there had been any consideration for or assent to the revised bonus plan, or whether the employee had acceded to the proposals contained in the letter of March 14, 1961, we think that the post-employment restraints unilaterally proposed by the employer and set forth in the revised bonus plans constituted an unlawful restriction on the employee to seek similar employment elsewhere. Since a strict enforcement of the restrictions would in effect preclude the employment of MacIntosh

as a salesman of bowling equipment anywhere in the United States, it is clear that Brunswick was without a right to forfeit the balance of the earned bonus due the employee.

The general rule in Maryland is that restrictive covenants in a contract of employment, by which an employee as a part of his agreement undertakes not to engage in a competing business or vocation with that of his employer on leaving the employment, will be sustained "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Silver v. Goldberger,* 231 Md. 1, 6, 188 A. 2d 155 (1963). See *Tawney v. Mutual System of Md.,* 186 Md. 508, 47 A. 2d 372 (1946); *Tolman Laundry v. Walker,* 171 Md. 7, 187 Atl. 836 (1936); *Deuerling v. City Baking Co.,* 155 Md. 280, 141 Atl. 542 (1928).

Although the contract in this case, concerning as it does the compensation to be paid an employee, can properly be classified as an employment contract, the restraint imposed by it as to area is unlimited and, for that reason, the claim that the restraint was necessary to protect the business interests of the former employer is unreasonable. Moreover, since the employee was discharged through no fault of his own to reduce the number of employees for the benefit of the employer and, as a result, the employee had been unemployed for more than two months because his previous training and experience had necessarily limited the type of work he could skillfully perform and be remuneratively paid therefor, it is apparent that the duration of the restrictive covenant had the effect of imposing undue hardship on the employee. *Silver v. Goldberger, supra.*

> *Judgment for costs in favor of appellee against appellant reversed; judgment entered in favor of appellant against appellee for $8,-487.40, with interest from January 12, 1965; costs below and in this Court to be paid by appellee.*