616 A.2d 426

**FAW, CASSON & CO., et al.**

v.

**K. Thomas EVERNGAM, Jr.**

**No. 285, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Nov. 30, 1992.

Allen R. Snyder (Douglas A. Fellman, Hogan & Hartson, Washington, D.C., Sally D. Adkins and Adkins, Potts & Smethurst, Salisbury, on the brief), for appellants.

David F. Albright (Harry M. Rifkin and Semmes, Bowen & Semmes, on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and BLOOM, JJ.

BISHOP, Judge.

Appellee/Cross–Appellant, K. Thomas Everngam ("Everngam") filed declarations (now referred to as complaints) in the Circuit Court for Talbot County against Appel-

lants/Cross–Appellees, Faw, Casson & Co. and its past and present partners (hereinafter collectively referred to as "FC"), alleging, *inter alia,* restraint of trade—statutory (Count One), restraint of trade—common law (Count Two), and breach of partnership agreement (Count Six). The trial court granted FC summary judgment as to Counts One and Two. The trial court then issued an order providing for the method by which damages under Count Six would be determined. Count Six was tried before a jury, after which judgment was entered in favor of Everngam. Counts Three, Four, Five, Seven and Eight are not relevant to this appeal.

### *Issues*

### FC's Appeal

I. Did the trial court err by ruling, as a matter of law, that the aggregate amount of Everngam's continued income participation payments would not be reduced to present value before being offset by Everngam's debt to FC?

II. Did the trial court err by allowing the jury to award prejudgment interest based upon FC's liability to Everngam, without instructing the jury to consider Everngam's liability to FC?

III. Did the trial court exclude evidence which should have been considered by the jury when considering whether pre-judgment interest should be awarded?

### Everngam's Cross–Appeal

IV. Did FC's withholding of continued income participation payments after Everngam violated the noncompetition covenant of the partnership agreement constitute an unreasonable restraint of trade under Maryland common law and statutory law?

### *Facts*

FC is a partnership engaged in the practice of public accounting. Everngam, a certified public accountant, be-

came a FC partner in 1965 and continued as such until he resigned effective June 2, 1983. During Everngam's tenure, the partnership was governed by a series of written partnership agreements, including the 1980 Faw, Casson & Company Partnership Agreement ("the Agreement"). This controversy arose when Everngam withdrew from the partnership and, almost immediately thereafter, became a partner in a competitive public accounting firm. The issues concern the interpretation and application of Sections XVII and XXI of the Agreement.

Section XXI of the Agreement included the following noncompetition covenant:

> Any partner withdrawing from the partnership voluntarily or involuntarily hereby covenants and agrees that he or she will not engage in the general practice of public accountancy or any of its allied branches, either individually or with any other person, firm or corporation, either directly or indirectly, at any place within a forty mile radius of any of our offices for a period of five years from the date of such withdrawal. If within these limits the partner engages in the general practice of public accountancy or any of its allied branches, ... he or she agrees to pay Faw, Casson & Co. or its successor, 100% of the prior year's fee for any clients that were Faw, Casson & Co.'s who engage the services of the withdrawing partner during the five year period. Any amounts due such partner under item XVII shall be forfeited by such partner. However, such forfeited vested amounts will be used to offset payments above. If there is a balance due Faw, Casson & Co. after offsetting of vested amounts, the partner's individual capital account will be used to offset the balance. Any remaining balance will be secured by a note to Faw, Casson & Co. from the partner payable over a three year period.

The Agreement's five year noncompetition period was judicially limited to three years in litigation that dealt with the

same agreement in *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 351, 572 A.2d 510 (1990). In the case *sub judice*, the parties limited the duration of the noncompetition covenant to three years.

It was four days after his withdrawal from FC that Everngam became a partner of another accounting firm located in Easton, Maryland, the same city where Everngam had practiced as a FC partner. During the next three years, over 300 clients and accounts of FC became clients of Everngam. Consequently, Everngam became indebted to FC for 100% of the prior year's fees of those clients under Section XXI's "fee-equivalent" formula (the "fee-equivalent damages"). At trial, the jury determined that the clients had generated a gross income of $253,975.00 to FC during the twelve months preceding Everngam's withdrawal.

Section XVII of the Agreement provided for Continued Income Participation ("CIP") payments:

Equal monthly [CIP] payments shall be made, without interest thereon, to a terminated partner for a period of ten years following the effective date of any termination. The aggregate amount, subject to adjustments as provided elsewhere in this agreement, of such [CIP] payments shall be an amount equal to the terminated partner's allocable share of the "fees" of the firm.

It was stipulated by counsel that Everngam was entitled to $419,117 in CIP payments. Nevertheless, no CIP payments were made following Everngam's departure. It was FC's original position that Everngam's CIP payments had been forfeited pursuant to Section XXI. At some point during the ensuing litigation, apparently as late as July of 1985, FC changed its position. FC stated that Everngam would be entitled to receive CIP payments to the extent they exceed the amount he owes FC under Section XXI. Everngam and FC did not resolve their differences regarding the offset between Everngam's CIP entitlement and FC's fee-equivalent damages.

On December 6, 1983, Everngam filed a declaration against FC in the Circuit Court for Talbot County; he

subsequently amended it on January 29, 1986. Referring to Section XXI's noncompetition covenant as applied to Everngam, Count One of the declaration alleged an unreasonable restraint of trade under the Maryland Antitrust Act, Md. Com.Law II Code Ann. § 11–204 (1990) and Count Two alleged an unreasonable restraint of trade under Maryland common law. Count Six of the Amended Declaration alleged FC failed to make payments due to Everngam under Section XVII of the Agreement. On December 3, 1985, the trial court granted FC's motion for summary judgment as to Counts One and Two, the counts alleging restraint of trade. On July 16, 1990, the trial court, in a letter to counsel, explained that damages under Count Six would be calculated:

> by offsetting the *total* aggregate amount that [FC] owed [Everngam] in C.I.P. payments pursuant to Section XVII ... against the *total* aggregate amount that [Everngam] owed [FC] pursuant to Section XXI's "fee-equivalent" liquidated damages clause and then calculating pre-judgment interest on the resulting difference....

(Emphasis in original). On June 5, 1991, the trial court issued an order directing the use of this formula in computing damages. It determined, however, that the award of pre-judgment interest would be an issue left to the jury's discretion.

At the conclusion of the two-day jury trial, Everngam was awarded $255,970 in damages under Count Six, which amount included $90,828 in pre-judgment interest. Accordingly, the jury found that the CIP payments due Everngam exceeded Everngam's liability to FC under the fee-equivalent formula of Section XXI by $165,142 ($255,970 minus $90,828). This appeal followed.

## I

*Computation of Damages—Count Six*

Maryland follows the objective law of contracts. *See State, Dep't of Economic and Community Dev. v.*

*Attman/Glazer P.B. Co.*, 323 Md. 592, 604, 594 A.2d 138 (1991); *Aetna Casualty & Surety Co. v. Insurance Comm'r*, 293 Md. 409, 420, 445 A.2d 14 (1982).

> A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contact intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give way to what the parties thought that the agreement meant or intended it to mean.

*General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985). "It is well settled that the construction of a written contract is ordinarily considered to be an issue of law for resolution by the trial judge." *Board of Educ. v. Plymouth Rubber Co.*, 82 Md.App. 9, 26, 569 A.2d 1288, *cert. denied*, 320 Md. 505, 578 A.2d 778 (1990). However,

> when there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances[,] . . . the contract [is] submitted to the trier of the fact for interpretation. Ambiguity arises if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language.

*Id.* (emphasis in original) (citations omitted). With these principles in mind, we now turn to the case *sub judice*.

▇▇▇ In its July 16, 1990 letter to counsel, the trial court explained its reasons for adopting Everngam's suggested approach to calculating damages.

[B]oth the plain language of Sections XVII and XXI of the Agreement, and the established practice of Faw, Casson as explained in *Holloway* necessitate such a conclusion.

. . . .

The compromise aggregate fee amount due [Everngam] under Section XVII ... was $420,000. According to the most reasonable construction of [Section XVII], the *aggregate amount* of $420,000, *subject to the adjustments set forth in Paragraph XXI of the Agreement* should have been paid by [FC] to [Everngam] over a period of time. Paragraph XXI clearly provides that aggregate vested C.I.P. 'will be used to offset payments due [FC].'

(Emphasis in original) (footnote omitted).

FC, however, maintains that several methods of performing the offset would be faithful to and consistent with the terms of the Agreement. First, FC suggests that payments due from FC to Everngam for CIP could be offset against payments due from Everngam to FC for client fee-equivalent damages, as each becomes due. In pretrial proceedings, FC submitted a chart on which was set out the required monthly payments by each party as they become due, on the first of each month after the date of Everngam's resignation. The chart demonstrated an ongoing reconciliation of payments and cumulative debt, including interest on the unpaid net balance outstanding each month. Under this "monthly offset" approach, FC calculated that as of the date of trial, Everngam owed FC $14,134 for past payments and FC owed Everngam $95,271 for future payments (a net balance of $81,137 due Everngam). FC used $275,000 as the amount owed by Everngam for fee-equivalent damages. Although this figure was reduced to $253,-975 by the jury, we shall adopt FC's estimate for the purposes of this discussion.

Alternatively, FC proposes a reduction to present value, as of Everngam's resignation date, of both the aggregate CIP payments otherwise due and payable to Everngam by

FC over ten years and the liability for fee-equivalent damages otherwise due and payable to FC by Everngam over three years. Under this "present value" approach, FC calculated its liability, as of the date of trial, to be $38,766, the difference between the CIP payments due Everngam reduced to present value ($420,000 reduced to $264,849) and the fee-equivalent damages due FC reduced to present value ($275,000 reduced to $226,083).

Section XVII of the Agreement provides that

[e]qual monthly [CIP] payments shall be made, without interest thereon, to a terminated partner for a period of ten years following the effective date of any termination. *The aggregate amount, subject to adjustments as provided elsewhere in this agreement, of such [CIP] payments shall be an amount equal to the terminated partner's allocable share of the "fees" of the firm.* The term "fees" for this purpose shall mean net professional fees, on the accrual basis of accounting, earned by the firm.... The increase (decrease) in each partners allocable share of the "fees" is based upon each partner's percentage of his income ... to the total partnership income in relation to the firms's total increase (decrease) in "fees" from one year to the next. The terminated partner's allocable net "fees" shall be limited by the application of the following vesting percentage rules.

(Emphasis added). Following this language are vesting percentage charts which list the number of years of service as a partner and the corresponding percentage of vesting. In the event a former partner violates the Agreement's noncompetition covenant, Section XXI makes clear that "[a]ny amounts due ... under [Section] XVII shall be forfeited.... [h]owever, such forfeited vested amounts will be used to offset payments [of fee-equivalent damages]."

FC contends that there is no support that "subject to adjustments as provided elsewhere in this agreement" (the "quoted language" in Section XVII, *supra*) is intended to refer in isolation to an offset under Section XXI, as opposed

to any other adjustments necessary to reconcile the respective obligations of the firm and a terminated partner. FC does not, however, supply us with any other provision of the Agreement to which it may refer.

FC argues the quoted language of Section XVII relates to an adjustment required in the multi-step formula for determining a partner's CIP entitlement. FC contends that under the trial court's construction of Section XVII, if "adjustment" does not refer to an adjustment to reflect the partner's vested percentage of the aggregate CIP, then a partner would, for purposes of an offset of fee-equivalent damages, always receive credit for 100% of the aggregate CIP, irrespective of his actual vested percentage. FC notes that Section XXI states: "such forfeited *vested* amounts will be used to offset payments above." Accordingly, FC claims that if "adjustments" in Section XVII does not mean application to the aggregate CIP of the appropriate percentage to determine the partner's vested CIP, then there is no way to get from aggregate amount to vested amount under the language of the Agreement.

FC maintains that language in Section XXI evidences an intent that an accounting or reconciliation between FC and a withdrawing partner who competes will occur on the basis of periodic payments or credits respecting reciprocal obligations as they become due. FC directs the Court's attention to the following language contained in Section XXI: "Any *amounts* due ... under [Section] XVII shall be forfeited.... However, such forfeited vested *amounts* will be used to offset *payments* [of fee-equivalent damages]" (emphasis added). It is urged that the use of the plural of "amount" and "payment" supports FC's alternative damage formula theories.

The Court of Appeals addressed the Agreement at issue *sub judice* in *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 572 A.2d 510 (1990). Holloway, a withdrawing FC partner, was entitled to $35,525 in CIP payments. *Id.* at 328, 572 A.2d 510. FC did not reduce Holloway's aggregate CIP entitlement to present value before subtracting FC's fee-

equivalent damages. *Id.* at 330, 572 A.2d 510. According to FC, this was not done because the fee-equivalent damages exceeded Holloway's aggregate CIP entitlement. Appellant/Cross–Appellee's Br. at 19–20. In passing, the Court mentioned in a footnote: "Holloway received, as credit for CIP, a lump sum in the total amount payable in monthly installments over a ten year period. Arguably, the credit to Holloway could have been only the present value of that stream of payments." *Id.* at 332–33 n. 3, 572 A.2d 510. Although the issue of present value reduction of vested CIP had not been raised in *Holloway,* the Court of Appeals commented on the matter. FC believes the Court's observation reflects logic, the clear language of the Agreement, the intent of the parties to it, and simple common sense. We, however, find footnote three unpersuasive for several reasons.

First, the Court of Appeals was probably referring to a situation where a withdrawing partner did not compete in violation of Section XXI, and received, by mutual agreement, a lump sum settlement of all CIP payments reduced to present value. This did not happen either in the case *sub judice* or in *Holloway.* Second, the present value issue of this case was not an issue in *Holloway.* The Court of Appeals was under no obligation to, and presumably did not, fully consider the relative merits; therefore, the Court's comment is of little significance. Third, the language used by the Court of Appeals was hypothetical in nature. The Court merely said *"[a]rguably,* the credit to Holloway could have been only the present value of that stream of payments." This language does not suggest that the Court, if presented with the issue, would rule that the Agreement called for reduction of CIP payments to present value. The Court simply suggested that the argument could be advanced. Indeed, it was.

FC cites *Sherley v. Sherley,* 118 Md. 1, 84 A. 160 (1912), *Dennis v. Blanchfield,* 48 Md.App. 325, 428 A.2d 80 (1981), *modified,* 292 Md. 319, 438 A.2d 1330 (1982), and *Chesapeake & Ohio Ry. v. Kelly,* 241 U.S. 485, 36 S.Ct. 630, 60

L.Ed. 1117 (1916), to support the proposition that Maryland law clearly recognizes that money payable in future install- ments, without interest, must be reduced to present value. These cases do not support FC's position; rather, they stand for the proposition that when damages are awarded at the time of trial for a loss in the future, they must first be reduced to present value. For example, in *Dennis*, a medical malpractice action, we held that a jury must be instructed to reduce to present value any damages awarded for the loss of future earning capacity. 48 Md.App. at 333, 428 A.2d 80. In the case *sub judice*, the damages awarded under Count Six were for a breach of the Agreement, an event resulting in primarily past, not future, damages. To the extent the jury's award included the twenty-two month- ly payments not yet due at the time of trial, a reduction to present value was in order. Indeed, the jury took this into account by modifying the net pre-judgment interest rate to reflect a reduction to present value of the twenty-two future monthly CIP payments.

Section XVII provides that a terminated partner shall be paid CIP "for a period of ten years following the effective date of any termination." At the time of termination, Everngam was entitled to $419,117.00 in CIP payments. In refining the definition of the amount of these payments, the Agreement continues to provide that the aggregate amount of CIP payments is "subject to adjustment as provided elsewhere in the agreement" and that this aggregate amount less adjustments shall be the terminating partner's share of the fees or his net CIP. The problem in this case is that, almost immediately upon termination, Everngam be- gan competing with FC in direct violation of the agreement. This triggered: 1) a forfeiture clause, and 2) the implemen- tation of a repayment schedule due to FC. Under the repayment schedule, Everngam was required to pay FC certain fees for all clients formerly represented by FC but who moved to Everngam during the first three years after his termination.

Since it had to be obvious to everyone concerned that there would be some offset of the aggregate CIP amount due to Everngam's representation of former FC clients, how, at the time of the termination, was it possible to subject the aggregate CIP amount to the "adjustment as provided elsewhere in the agreement" assuming that these adjustments refer to the client fee equivalent damages? What were the legal responsibilities of FC vis-a-vis Everngam under the above set of facts?

There seems to be little question that FC initially activated the forfeiture clause, but then sometime later abandoned it. How do we determine the aggregate amount less the adjustments if we have no way of knowing the amount of the adjustments at the time of the termination?

In order to implement the terms of Section XVII, it is necessary to know two factors: 1) the aggregate amount of CIP, and 2) the amount of the "adjustments as provided elsewhere in the agreement." The first factor was known on the date of termination. The second factor could not be known until at least three years from the date of termination.

Based on the foregoing, there is no way of determining what the ultimate amount of the terminated partner's share of the fees of the firm would be at the time of termination. One interpretation would be that, in view of Everngam's precipitous competitive act, FC would withhold any payments for three years until it was determined what the effect might be. FC could then begin making payments in 120 increments while at the same time taking credit for the payments that would be due FC from Everngam. It seems clear that Everngam's payments would far exceed the amount due him from FC, at least initially. Some arrangements would have to be made to accommodate that situation.

There are yet other possibilities. Everngam and FC could have agreed on a stipulated figure so that Everngam's CIP payments could have been accelerated. There are all kinds

of possibilities that indicate that Section XVII is not an example of clarity. This leads to the conclusion that there is a *bona fide* ambiguity in the contract's language and a legitimate doubt as to the manner of its application under the circumstances. Therefore, on remand, the trial court shall allow the jury to award damages for Count Six based on its own interpretation of Section XVII.

## II.

### *Jury Instructions—Count Six*

The trial court instructed the jury as to how it should arrive at a damage award for Count Six.

Now, the parties are not really in disagreement as to the amount of the these [sic] CIP payments to which plaintiff is entitled, and they have agreed ... that the plaintiff is entitled to $419,117 in CIP payments.... The agreement, however, also provides that there was a set-off to any such payments that plaintiff is entitled to, to the extent that clients with whom the plaintiff dealt while with Faw Casson, left Faw Casson and went with his new firm....

. . . .

I think, as you can see now, we really are presenting you with a formula. You will take the CIP payments; you will subtract from that those amounts that counsel have agreed upon with respect to those clients that you feel had direct contact with the plaintiff while he was at Faw Casson. And if you apply that formula, you will then have a figure left, and that would be the amount to which you will indicate the plaintiff is entitled to recover....

Again then, when you make that determination you will then again consider whether or not you deem it appropriate to award interest. And if you do, then you will indicate in there what amount of interest you have included in the amount of the award.

In light of our holding in Section I, *supra*, the trial court erroneously instructed the jury how to arrive at its award of damages under Count Six.

## III.

### *Exclusion of Evidence*

During direct examination of FC's managing partner ("Falconetti"), the following testimony was elicited:

Q. Why is it that the firm has not made any of the C.I.—the continuing income participation payments to date?

A. Well, based upon the firm's calculation, applying interest to both parties, the firm does not owe Mr. Everngam any money as of today. In fact, as of 9–1–91, Mr. Everngam owes the firm approximately $13,000.

Shortly thereafter, a bench conference was held during which counsel for FC argued that a line of questioning should be permitted which would explain to the jury how FC determined that it did not owe Everngam any amount under the Agreement. FC wished to have Falconetti describe how FC arrived at its figures using its present value and monthly offset calculations. The trial court stated, "[t]he only way you can get that in is by asking why—and he may he [sic] say on a monthly basis—they decided they didn't owe it. But I'm not going to get into [the present value and monthly offset calculations]." Thereafter, the following colloquy ensued:

Mr. Snyder: Mr. Falconetti, did the—was—did the firm have—without telling me what it is exactly, did the firm have a basis and a analysis that provided the basis for the firm not making payments in the early years to Mr. Falconetti [sic]? Is there an objection to that question?

Mr. Albright: Oh, I object.

The Court: Overruled.

Mr. Falconetti: Yes.

Mr. Snyder: Can I ask the witness what that basis is or is that as far as I should go?

Mr. Albright: I object, Your Honor?

The Court: I think you can ask him, but I'm not going to allow him to answer.

Mr. Snyder: Okay, Your Honor. Well, we'll move on to another issue.

FC assigns as error the trial court's exclusion of the proffered evidence. They argue that the evidence bears upon the equity or inequity of awarding pre-judgment interest, and therefore the trial court was under an obligation to permit FC to introduce evidence illustrating the impact and practical meaning of the acceleration of vested CIP payments to a lump sum without reduction to present value. They suggest such evidence would have informed the jury of FC's reasons for and justification in not paying Everngam's CIP payments as they became due.

It is not necessary to reach the merits of this issue because of our holding in Section I, *supra.*

## IV.

### *Cross–Appeal*

■ On December 3, 1985, the trial court granted FC's motion for summary judgment as to Counts One and Two. Referring to Section XXI's noncompetition covenant as applied to Everngam, Count One of the Declarations alleged an unreasonable restraint of trade under the Maryland Antitrust Act, Md.Com.Law II Code Ann. § 11–204 (1990), and Count Two alleged an unreasonable restraint of trade under Maryland common law. Everngam complains that the trial court erroneously granted summary judgment in favor of FC. For reasons which follow, we disagree.

Everngam maintains that FC has consistently interpreted the Agreement as calling for a forfeiture of CIP benefits upon a withdrawing partner's competition with FC in violation of the Agreement's noncompetition covenant. He alleges FC has always applied the forfeiture to him, and that their present value or monthly offset approaches are "just masks to accomplish the same end, that end being that

$254,000 worth of clients justifies the denial to [Everngam] of all of his earned $419,117 in CIP."

Everngam's underlying complaint is that the forfeiture provision of Section XXI unreasonably restrains his ability to practice accountancy and the public's ability to avail itself of his services. Everngam cites *Holloway v. Faw, Casson & Co.*, 78 Md.App. 205, 242–43, 552 A.2d 1311 (1989), *aff'd in part and rev'd in part*, 319 Md. 324, 572 A.2d 510 (1990), and *MacIntosh v. Brunswick Corp.*, 241 Md. 24, 215 A.2d 222 (1965), as support for his position. *Holloway* and *MacIntosh*, however, are inapposite.

In *Holloway*, we held that:

[t]he *forfeiture of the employees CIP benefits* for any breach of the agreement constitutes a *penalty....* The employee's CIP payments have no reasonable relation to the anticipated damages caused by Holloway's breach and, therefore, their forfeiture can not "reasonably be compensation for the damages anticipated by the breach."

... The only purpose for such a payment can be to *penalize* the employee, which makes this provision *unenforceable.*

*Holloway*, 78 Md.App. at 242–43, 552 A.2d 1311 (emphasis added) (citations omitted). In short, we held that the forfeiture provision was an unenforceable *penalty*. We did not hold, however, that the forfeiture provision was an unreasonable restraint of trade. Everngam implicitly suggests that an "unenforceable penalty" necessarily constitutes an "unreasonable restraint of trade." We disagree.

In *MacIntosh*, the Court of Appeals considered an employment contract which provided for the forfeiture of earned compensation in the event the employee " 'wilfully perform[ed] any act contrary to the welfare [or] best interest of the Company ... [such as] [e]ngaging directly or indirectly in any business activity substantially competitive with the business of the Company.' " 241 Md. at 28–29, 215 A.2d 222. Everngam states in his reply brief that *MacIntosh* "expressly held that a restriction forfeiting [compensa-

tion] earned by an employee upon the former employee's termination of his employment and competition with the employer is an unlawful restriction on trade and commerce." Everngam, however, misinterprets the Court's holding in *MacIntosh.*

Contrary to Everngam's suggestion, the Court did not hold that the forfeiture clause in *MacIntosh* constituted an unreasonable restraint of trade. First, the Court recognized that the terms of the employment contract with reference to "salary and bonus" were changed without notice to the employee. The Court held that "such post-employment provisions were not enforceable against the employee as to the bonus which had been previously earned." *Id.* at 30, 215 A.2d 222. As a second, independent basis for its decision, the Court further held, irrespective of the issues of notice, consideration, and assent, that the restraint was not " 'confined within limits ... no wider as to area and duration than ... reasonably necessary for the protection of the business of the employer.' " *Id.* at 31, 215 A.2d 222. Based on that reason alone, the Court held that the employer unreasonably withheld the employee's earned compensation.

After a careful reading of *MacIntosh,* we fail to see where the Court "held" that the forfeiture provision constituted an *unreasonable restraint of trade.* It is clear in *MacIntosh* the employee only brought suit under a breach of contract theory, not a restraint of trade theory. To the extent the Court used language to the effect that the forfeiture clause constituted an "unlawful restriction on the employee to seek similar employment elsewhere," its use was mere dicta. The Court was not asked to determine whether the provision constituted an unreasonable restraint of trade. Indeed, the Court did not rely on such a finding as the basis for its holdings.

■ FC denies that they continue to pursue the forfeiture remedy available under Section XXI of the Agreement. Although FC's demurrer to Everngam's declaration averred

that Everngam forfeited his entitlement to vested CIP payments, FC's memorandum in support of a motion for summary judgment (Counts One, Two, and Three) filed on or after July 17, 1985 acknowledged its potential liability to Everngam in the event the CIP payments exceeded Everngam's liability for fee-equivalent damages. In their motion for summary judgment filed on September 15, 1987, FC again claimed forfeiture under Section XXI, but nevertheless continued to recognize that if the CIP payments exceeded Everngam's liability for fee-equivalent damages, they would owe Everngam the difference. The arguments raised in both FC's and Everngam's briefs side-step the essential issue, i.e., whether in the case *sub judice,* the *effect* of the forfeiture provision of Section XXI renders it an unreasonable restraint of trade under Maryland statutory and common law. "Of primary importance is the 'market impact' of the alleged restraint, and 'the challenged restraint's impact on competitive conditions'. The way in which a covenant is *phrased* tells nothing about its 'market impact'. And, unless there is a significant adverse 'market impact', the covenant does not violate [antitrust law]." *Lektro–Vend Corp. v. Vendo Corp.,* 500 F.Supp. 332, 354–55 (N.D.Ill.1980) (emphasis in original) (citations omitted), *aff'd,* 660 F.2d 255 (7th Cir.1981), *cert. denied,* 434 U.S. 425, 98 S.Ct. 702, 54 L.Ed.2d 659 (1978). Under the particular circumstances of this case, the trial court properly entered summary judgment in favor of FC. We explain.

The provision of the Maryland Antitrust Act (the "Act") which Everngam advances as the basis for Count One provides that "[a] person may not ... [b]y contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce...." Md.Com.Law II Code Ann. § 11–204(a)(1) (1990). The General Assembly enacted the Act "to complement the body of the federal law governing restraints of trade." *Id.* § 11–202(a)(1). In construing the Act, "courts [are to] be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters." *Id.*

§ 11–202(a)(2). "Section 11–204(a)(1) of the Maryland Act is essentially the same as § 1 of the Sherman Antitrust Act of July 2, 1890, 26 Stat. 209, as amended, 15 U.S.C. § 1. Thus, decisions of the federal courts interpreting § 1 of the Sherman Act guide us here." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 53, 485 A.2d 663 (1984).

In *Graham v. Hudgins, Thompson, Ball and Assocs., Inc.*, 319 F.Supp. 1335, 1336 (N.D.Okla.1970), an employee brought suit against his former employer alleging a violation of § 1 of the Sherman Act. The employee participated in an

> Employee Profit Sharing Plan which provided among other things, that an employee would receive from the trust funds therein provided, 10% of the account after completing four years service, 20% after five years service, 30% after six years service and so on until at the completion of thirteen years the employee would be entitled to 100% of such funds.

*Graham v. Hudgins, Thompson, Ball and Assocs., Inc.*, 540 P.2d 1161, 1162 (Okla.1975). Under the Plan, "if the [employee] terminated employment in order to work for a competitor[,] then no benefits of any kind would be paid...." *Id.* The employee resigned, went to work for a competitor, and was subsequently denied benefits under the Plan. *Id.*

The employee argued that the "forfeiture provision of the Plan constitute[d] a covenant not to compete, the reasonableness of which must be reviewed by [the] Court in a trial on the merits." *Graham*, 319 F.Supp. at 1337. However, the District Court thought otherwise.

> [I]n order to review the reasonableness of a restraint, there must first exist restraint and none seems to appear among Plaintiff's allegations. The trade alleged to be affected is the market which exists for Plaintiff's services. However, the only restraint that appears to be imposed on Plaintiff is that of his desire for payment of his inchoate share of the funds of the Plan. Plaintiff makes no claim that this forfeiture provision coerces any pro-

spective employer into not hiring him. There is nothing in the Complaint to indicate that prospective employers are discouraged in any way from competing for Plaintiff's services. The Court is unable to perceive how Plaintiff's failure to receive certain claimed benefits from his former employer restrains others from competing for his services.

*Id.* at 1337–38.

The Tenth Circuit faced a similar situation in *Cinelli v. American Home Prods. Corp.*, 785 F.2d 264 (10th Cir.1986). In *Cinelli,* an attorney-employee "became entitled to contingent stock awards to be distributed over a ten-year period after the termination of his employment.... The benefits were part of a 'Management Incentive Plan,' the germane portion of which ... provided:

No payment ... shall be made to any Employee after termination of employment unless he shall have ... *refrained from becoming or serving as an officer, director or employee of any* [competing entity or entity providing any service to a competitor.] I[f] these conditions are not fulfilled, no further payment ... shall thereafter be made ... and all ... rights with respect to [the Plan] shall ... be forfeited.

*Id.* at 265 (emphasis in original). Shortly after his resignation, the attorney-employee forfeited rights to future payments under the Plan upon his past-employer's determination that his new employer was a competitor. *Id.*

The attorney-employee "argue[d] the forfeiture clause in the deferred compensation plan unreasonably restrain[ed] trade in violation of the Sherman Act § 1, et seq. by limiting and subjecting to substantial penalty his freedom as a lawyer to serve clients deemed by [his former employer] to be competitors." *Id.* at 266 (citation omitted). After recognizing that "courts have consistently held that forfeitures similar to that present here do not violate federal antitrust laws because they do not prevent post-termination employment," the Court made these remarks:

Plaintiff artfully seeks to avoid the implication of this rule. While tacitly recognizing that AH's forfeiture clause did not prevent him from seeking employment with an AH competitor, he argues the *effect* of the clause was a restraint on his freedom to choose an employer. He contends that the mere threat of an economic sanction results in an unreasonable and practical constraint on his ability to market his talent. In short, he attempts to blur, if not totally obliterate, the lines historically drawn between restrictions which actually seek to interdict post-termination employment and those which merely make such employment unpalatable.

*Id.*

In both *Graham* and *Cinelli*, the Courts were faced with forfeitures of *unvested* interests in deferred compensation accounts. There is a suggestion that federal courts would view the situation differently if, as in the case *sub judice*, the entitlement was vested. *See Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 845 & n. 13 (5th Cir.1975) ("In the case of forfeiture of a vested interest, the restraint upon the employee's freedom to follow a chosen vocation is more immediate, since it impacts directly upon what is, by the parties' mutual agreement, *his* property instead of the employer's or the trust's."). However, we see no significant distinction, especially in light of the particular facts of this case. In any event, this Court is only to be guided, and not bound, by the federal courts' interpretation of the Sherman Act. *See Greenbelt Homes, Inc. v. Nyman Realty, Inc.*, 48 Md.App. 42, 48, 426 A.2d 394 (1981).

In the case *sub judice*, Everngam fails to show how the forfeiture clause has imposed an unreasonable restraint of trade. Everngam's resignation from FC was effective Thursday, June 2, 1983. The following Monday, Everngam became a partner of a competing accounting firm in the same city. Everngam and his new firm proceeded to service former FC clients. Within three years, he took a quarter of a million dollars in annual fees from FC. Everngam does not address in his brief how these facts amount to

a "restraint of trade". Instead, Everngam baldly asserts that the forfeiture provision of Section XXI is an unreasonable restraint on his ability to practice accountancy and the public's ability to avail itself of his services. Quite to the contrary, both Everngam's ability to practice accountancy and the public's ability to avail itself of his services were remarkably unaffected by the forfeiture clause.

"Despite the siren-like quality of these arguments, they are unsupported by authority and contrary to what we perceive to be the law." *Cinelli*, 785 F.2d at 266. Even if FC was withholding Everngam's CIP payments pursuant to the forfeiture provision, Everngam has failed to establish damages resulting from an unreasonable restraint of trade. Although FC may not have an excuse for withholding CIP payments beyond the point at which Everngam's liability for fee-equivalent damages could be assessed, FC's actions were, at worst, *unreasonable*. They do not, however, constitute an *unreasonable restraint of trade*. The damages awarded by the jury under Count Six are adequate to compensate Everngam for FC's breach of the partnership agreement.

Accordingly, we hold that the trial court correctly granted summary judgment in favor of FC on Count One. For the same reasons, summary judgment was properly entered in favor of FC on Count Two.

JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR A NEW TRIAL ON COUNT SIX; COSTS TO BE PAID BY APPELLEE/CROSS-APPELLANT.