GILL *v.* COMPUTER EQUIPMENT CORPORATION

[No. 384, September Term, 1971.]

*Decided June 30, 1972.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and IRVING A LEVINE, Associate Judge of the Sixth Judicial Circuit, specially assigned.

*Courtland K. Townsend, Jr.,* with whom were *Clark & Cromwell* on the brief, for appellant.

*Robert L. Burchett,* with whom were *Miller, Miller & Canby* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Appellant, Earl F. Gill (Gill), sued appellee, Computer Equipment Corporation (Computer), for breach of contract in allegedly failing to honor an employment contract. A jury returned a verdict in favor of Gill in the amount of $20,000, which was set aside when the trial court entered judgment *n.o.v.* in favor of Computer, the defendant, upon its seasonably filed motion. The second count of Gill's declaration asked for a declaratory judgment that a covenant not to compete was void. The trial court ruled against Gill upon that count also. Gill has filed appeals from both actions of the trial court. We shall affirm.

Gill and B. J. Fadden had been partners in a manufacturers' representative business known as Eastronics. They later incorporated under the name of Eastronics, Inc. In 1969 conversations took place between the executive vice-president of Computer and Messrs. Gill and Fadden culminating in a contract under which shares of Eastronics stock were exchanged for shares of Computer, Gill and Fadden were employed by Computer, provision was made for bonuses to them based upon the earnings of a new division to be known as "Peripheral Systems Division of Computer Equipment" set up to take over the business of Eastronics, an annual salary of $25,000 each was agreed upon as to Gill and Fadden, and each stockholder agreed that "should he leave the employment of Computer for any reason, he [would] not compete with Computer for a period of two (2) years following such termination of employment."

The relationship between the parties terminated when Computer sent Gill a telegram on July 8, 1970, advising that sales were not developing satisfactorily, that Gill's employment was terminated that date "with salary including vacation paid thru end of July," and that his

"rights to any future CEC shares earned under terms purchase agreement between CEC and shareholders of Eastronics [would] of course be protected for the term of the agreement." This suit followed on September 2, 1970.

## JUDGMENT *N.O.V.*

The jury returned a verdict in the amount of $20,000 in favor of Gill. Gill had sought to prove that the true intent of the agreement between him and Computer was to employ him for a definite term of three years, commencing on May 28, 1969, when the agreement was executed. The trial judge permitted the introduction of testimony of prior discussions between Gill and Computer's representative because he felt that the written agreement was rendered ambiguous by an apparent conflict between two paragraphs. On the motion for judgment *n.o.v.* the court reversed itself, holding that it had erred in permitting admission of this testimony, that the contract was not ambiguous. It further observed:

> "However, assuming this evidence had been properly admitted, we think the jury's verdict was wrong because it was against the clear weight of the evidence."

We consider this case bearing in mind the oft quoted rule that on appellate review of a motion for judgment *n.o.v.* the evidence and the reasonable inferences to be drawn from it must be considered in the manner most favorable to the party opposing the motion, in this instance, Gill. *Lusby v. First Nat'l Bank*, 263 Md. 492, 499, 283 A. 2d 570 (1971).

Section 11.01 of the contract provided that "[e]ffective immediately upon Closing Computer agree[d] to employ each of the Stockholders at an annual salary of $25,000.00, and the Stockholders agree[d] to accept such employment and devote their full time and best efforts thereto." It was silent as to the period of employment. The bonus provision provided for additional shares for

Gill and Fadden in Computer based upon the earnings of Peripheral Systems Division "for the calendar years 1969, 1970, and 1971."

The two sections originally regarded as conflicting were § 13.04 and § 13.06 which read:

"13.04 *Entire Agreement.* This Agreement contains the entire agreement between the parties hereto and supersedes any and all prior agreements, arrangements or understandings between the parties relating to the acquisition of Eastronics by Computer. No oral understandings, statements, promises or inducements contrary to the terms of this Agreement exist. No representations, warranties, covenants or conditions, express or implied, whether by statute or otherwise, other than as set forth herein, have been made by either Stockholders or by Computer. No waiver of any term, provision or condition of this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such term, provision or condition, or of any other term, provision or condition of this Agreement. This Agreement cannot be changed or terminated orally."

"13.06 *Survival of Representations, Etc.* All representations, warranties and covenants made by Stockholders and by Computer (as the case may be) in this Agreement or pursuant hereto, shall be deemed joint and several (except as otherwise expressly stated) and made for the purpose of inducing Computer or the Stockholders (as the case may be) to enter into this Agreement, and shall survive the Closing and remain operative and in full force and effect regardless of any investigations at any time made by or on behalf of the party or parties to whom such representations or warranties are

made, and shall not be deemed merged in any document or instrument executed or delivered at the Closing."

On direct examination of Gill there was but a single reference to the term of the employment contract. The record is:

"Q. Were there any specifics discussed between you and Mr. Fadden on the one hand and Mr. Gundy and Mr. Moore on the other hand with respect to the term of your employment? A. Yes, we talked. They illustrated to us the method of remuneration. They proposed a salary of $25,000.00 and illustrated how in the first year and second year and third year the bonus plans would operate.

"Then there was some discussion as to the exact number of shares that we were to receive for Eastronics.

"At the conclusion of it when we agreed on the number of shares everybody jumped up and I remember very plainly we all shook hands and Mr. Gundy said, 'We are glad to have you aboard. We will send you a written contract which will obligate you to us for three years, but we hope you will stay longer than that.'

"Then the meeting was over.

"Q. That was said by Mr. Gundy? A. That was said by Mr. Gundy to Mr. Fadden and I at the meeting.

"Q. And the bonus contingent shares and so on you are relating are the same as set forth in the agreement? A. Yes."

On cross-examination of Gill the record is in part as follows:

"Q. Let's back up a minute.

"I believe you testified that you first met Mr.

Gundy sometime in 1968; is that correct? A. Yes.

"Q. Now, you say that you came to a meeting of the minds of this merger in New York? A. Yes.

\* \* \*

"Q. How was that meeting of the minds consummated, if you understand what I mean?

"How did you know that they knew you had an agreement? A. Well, we agreed on their number of stock for the exchange of Eastronics and everybody got up and shook hands and Phil said, 'Welcome aboard. We will be sending you the contract.'

"Q. Was there anything in that agreement reduced to writing at that time? A. No.

"Q. Had it been reduced to writing prior thereto? A. No.

"Q. I believe you testified Mr. Gundy shook your hand and said, 'Welcome aboard. You are committed to CEC for three years.'? A. He said, 'We will be sending you a written contract which obligates you to CEC for a three-year period, but we hope you will stay longer.'

"Q. Before you said that you had a meeting of the minds? A. Yes, he had been discussing the three-year period, at least three years, of which there was to be remuneration based upon sales and upon bonuses and shares of stock and so forth. This seemed to be the culmination of everything.

"Q. You say he was discussing remuneration? A. He very carefully outlined how remuneration was to take place and how to get the shares [in] the first, second and third year.

"Q. That deals with the pay-out and compensation for the purchase of Eastronics? A. Oh, no. That has nothing to do with that.

"The purchase of Eastronics was incidental

to the whole thing. It was us he wanted. This was a method of acquiring us since we had a business.

"Q. Prior to Mr. Gundy making this alleged statement and the handshake, was there any specific discussion between you and Mr. Gundy as to the period of your employment with CEC? A. No, we *assumed* when we were talking and he talked about three years it was three years. We were talking about employment and salaries and bonuses we could earn and we *assumed* we were going to be there to earn them.

"Q. Was it your *assumption* prior to that handshake you were being employed for three years? A. Yes, really, in fact, we had expectations of making more money without CEC at that time and if it hadn't been for the fact we were going to be employed for three years, that we had some degree of security built in at that point of time, we weren't about to take less salary.

\* \* \*

"Q. You say that with all this discussion in this hotel room about this three-year period and it was your assumption that related to the terms of employment? A. Yes, it wasn't all that discussion, it was in the discussion.

"Q. When he mentioned the obligation for three years with the handshake was that the first you heard of the three-year employment? A. No, we had been discussing the employment and the compensation.

"Q. Mr. Gill, you remember being deposed in my office on the 22nd of February of this year, don't you? A. Yes, sir.

"Q. I refer you to page 16, the last question.
'Question: When did you go to work for them?
'Answer: Went to work for them vir-

tually immediately after the agreement in March that we would do this, and, in fact, I remember it very distinctly. We were all in a hotel room, and we spent several hours talking about how we would do it and what we would do, and so forth, and we agreed on the figure of the exchange of stock. And at that point in time everybody stood and shook hands and Phil Gundy said, "Welcome to Computer Equipment Corporation. We'll be sending you a contract. You're obligated to us for three years, but we hope you fellows will stay longer."

'Question: Was there any discussion with him about the period of your employment?

'Answer: Well, that was the discussion.

'Question: Was that all it consisted of?

'Answer: That was all it consisted of, and when we got the contract I took it to my attorney and I read it and he read it. And it was his opinion that because of the statements'—

"I am not going to read his opinion.

"It seems at variance with what you are telling us now.

\* \* \*

"Q. I would like you to explain, did you mean there was no discussion until the handshake and he said, 'Welcome aboard. You are here for three years.'? A. I didn't say that at all. I don't follow what you are trying to get at.

"We discussed during the meeting the compensation. They brought up how we were to be compensated over the three-year period and we *assumed* that that was, they were talking about employment for a three-year period.

"I don't see what I have just said that is at variance with what you have just read." (Emphasis added.)

At no point was there evidence presented from any source that Computer bound itself to employ Gill and Fadden for a three-year period. The contract sent to them did not call for this. Other parties present even denied Gill's version of what was said. In *McCullough Iron Co. v. Carpenter*, 67 Md. 554, 11 A. 176 (1887), our predecessors observed:

> "There can be no doubt that, in this country, the rule is, an indefinite hiring is *prima facie* a hiring at will. It is also well settled that a hiring at so much a week, month or year, no time being specified, does not, of itself, make more than an indefinite hiring. It is competent for the parties to show what the mutual understanding was, but unless there was a mutual understanding, it is only an indefinite hiring. [Citing authorities.] . . . Now under the law as we understand it to be, if the plaintiff's case rested solely upon his own testimony, there would seem to be no escape from instructing the jury there was no legally sufficient evidence of a contract for a yearly hiring." *Id.* at 557.

As Chief Judge Robinson observed in *Baltimore & O.R.R. v. Stewart*, 79 Md. 487, 498, 29 A. 964 (1894), "[A party is] in no manner bound by the assumptions or belief of the witness. They are bound by the contract itself, construed by the same rules of law which govern all other contracts." We have nothing offered here to bind Computer other than the assumption of the witness. Accordingly, assuming *arguendo* that the parol evidence was admissible, Gill has failed to establish an employment contract other than a hiring at will. Therefore, Judge Mathias did not err in entering judgment *n.o.v.* in favor of Computer, the defendant.

## THE NONCOMPETITIVE AGREEMENT

Section 12.01 of the contract provided:

"12.01 *Covenant not to Compete.* Each Stock-

holder covenants and agrees that, should he leave the employment of Computer for any reason, he will not compete with Computer for a period of two (2) years following such termination of employment. Competing shall be defined as (1) working in an executive, administrative, sales or service capacity for any manufacturer which was represented by the Peripheral Systems Division during all or any part of the one (1) year period immediately preceding the date of such termination of employment; or (2) working for a sales representative and/or service organization which represents any such manufacturer; or (3) selling or servicing the products of any such manufacturer as an independent representative."

It will be noted that although no territorial limitation is imposed that competition is defined, in effect, as working for customers of Peripheral Systems Division of the year prior to termination of employment.

Gill cites *Ruhl v. Bartlett Tree Co.*, 245 Md. 118, 225 A. 2d 288 (1967), where, citing *MacIntosh v. Brunswick*, 241 Md. 24, 31, 215 A. 2d 222 (1965), the Court observed that the general rule in Maryland, as in most jurisdictions, is that restrictive covenants in a contract of employment by which an employee as a part of his employment contract agrees not to engage in a competing business or vocation with that of his employer on leaving the employment will be sustained if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interest of the public. Gill then goes on to fashion an argument that the clause here is unduly restrictive because it contains no limitation as to area.

Oddly enough, neither party cited *Tuttle v. Riggs-Warfield-Roloson*, 251 Md. 45, 246 A. 2d 588 (1968). There

the employee agreed to "refrain, for a period of two years beginning with the effective date of such termination, from engaging either directly or indirectly, in any insurance activities with *customers* of Riggs-Warfield-Roloson, Inc." (Emphasis added.) The trial court there found that the restrictive covenant was valid, the agreement being reasonable as to time and scope. Judge Marbury said for the Court:

"We agree with the lower court that the agreement in question was a valid and enforceable contract." *Id.* at 49.

We see no difference between this case and *Tuttle*. The time is the same in both cases. The scope of the limitation here basically is to customers of Computer in the narrow area in which Gill was employed. Actually this restriction might be more favorable to the employee than that in *Tuttle*. There in a general insurance brokerage business the employee serviced certain accounts already on the books, developed new business from those accounts, and developed new accounts. He was not restricted from dealing only with customers he had formerly served, but "from engaging either directly or indirectly in any insurance activities with customers" of his employer. Computer's activities were not confined to its Peripheral Systems Division. Gill's testimony showed that the larger part of the contact with customers of that division was by him. He was restricted in his employment only as to customers of that division. He was otherwise free to operate whenever and wherever he chose. The restriction was not unreasonable. *Tuttle* is controlling here.

*Judgments affirmed; appellant to pay the costs.*