## DEUTSCHE POST GLOBAL MAIL, LTD.,

v.

## Gerard CONRAD, et. al.

### No. CIV. JFM–03–863.

United States District Court, D. Maryland.

Nov. 14, 2003.

---

Gary A. Winters, Mayer, Brown, Rowe and Maw, Andrew A. Nicely, Law Office, Washington, DC, for Plaintiff.

Harriet E. Cooperman, Saul Ewing, LLP, Baltimore, MD, for Defendants.

## OPINION

MOTZ, District Judge.

Plaintiff Deutsche Post Global Mail, Ltd. ("DPGM") has brought this suit against Defendants Gerard Conrad and Guy Gemmill, who are former employees of DPGM, and Postal Logistics International ("PLI"), a corporation formed by Conrad and Gemmill DPGM claims that Conrad and Gemmill violated restrictive covenants contained in their employment contracts by forming PLI after their departure from DPGM.[1]

---

1. DPGM originally asserted claims for (1) breach of contract, (2) breach of fiduciary duty, (3) misappropriation of trade secrets and confidential information, (4) tortious interference with existing and prospective con-

At the same time that it filed the complaint, DPGM moved for a preliminary injunction to bar Defendants from soliciting or diverting any customers that were customers of DPGM at the time Conrad and Gemmill terminated their employment with DPGM. After holding a hearing, I denied the motion. Discovery has now been completed, and Defendants have filed a motion for summary judgment. DPGM has filed a cross-motion for partial summary judgment on the issue of liability. For the reasons stated below, Defendants' motion for summary judgment will be granted, and DPGM's cross-motion for summary judgment will be denied. The basis for my decision is that the portion of the restrictive covenants prohibiting solicitation of all customers of DPGM is overly broad and cannot be saved by "blue penciling."

## I.

Gemmill and Conrad were hired as sales managers by International Postal Consultants ("IPC"), in June 1997 and January 1999, respectively. IPC was an international mail company, engaged in the business of providing shipping services to customers who send a substantial volume of mail, parcels, and other items to destinations outside the United States. As sales managers, Conrad and Gemmill identified and solicited potential customers who may have been in need of international mailing services, sold them IPC's services, and managed their accounts. Conrad and Gemmill worked out of IPC's Maryland headquarters, and their sales territory included Maryland, Virginia, and the District of Columbia. However, IPC permitted sales managers to solicit and obtain business outside their assigned territories, as long as they did not encroach on identified prospects or customers of the IPC manager assigned to that area.

When they began their employment with IPC, both Conrad and Gemmill executed employment contracts, each of which contained a section 5 entitled "Restriction and Covenant Not to Compete." Section 5 provides in pertinent part:

(a) Sales Representative covenants and agrees that during the term of his/her employment with the Company, and in the event of and for a period of two (2) years following the termination of his employment with the Company for any reason, he/she shall not, without the prior written consent of the Company, directly or indirectly:

...(ii) Engage in any activity which may affect adversely the interests of the Company or any Related Corporation and the businesses conducted by either of them, including, without limitation, directly or indirectly soliciting or diverting customers and/or employees of the Company or any Related Corporation or attempting to so solicit or divert such customers and/or employees, or

(iii) Engage in any capacity whatsoever (whether as stockholder, officer, director, employee, agent, consultant, advisory or investor) in any form of business entity seeking to engage or engaging in any activity which is then in competition with the company or any Related Corporation in such geographical or territorial markets as the Company or any Related Corporation then is doing or seeking to do business. It is intended that this prohibition of competitive activity be proscribed only in such geographical area in which the Company then is engaged. Sales Representative agrees that the term, scope,

---

tractual and business relationships, (5) Virginia business conspiracy, (6) civil conspiracy, (7) unfair competition, and (8) unjust enrich-

ment. It now is pursuing only its breach of contract claim, however.

and geographic area of the covenants contained herein are reasonable and necessary; however, if any court of competent jurisdiction shall determine this covenant to be unenforceable as to either the term, scope, or geographic area imposed above, then this covenant nevertheless shall be enforceable by such court as to such shorter term, such lesser scope or within such lesser geographic area as may be determined by the court to be reasonable and enforceable. If such court shall refuse to enforce this covenant as to a particular geographic area, then, in such event, the parties hereto declare and agree that for a period of two (2) years from the date on which employment of Sales Representative terminates for any reason, Sales Representative shall be prohibited from soliciting all persons to whom the Company has sold products or rendered services during the three (3) year period immediately preceding the termination of the Sales Representative.

(Defs.' Mem. in support of Mot. for Summ. Judg. Ex. A12).

In July 2000, DPGM purchased all of the stock of IPC. DPGM is another international mail company that used to operate under the name "Global Mail, Ltd." In October 1998, Global Mail was acquired by Deutsche Post World Net ("DPWN"), a multinational company with revenues in 2002 of more than $39 billion. After the acquisition by DPWN, Global Mail changed its name to DPGM.

For the first six months following the stock purchase of IPC by DPGM, IPC continued to operate independently. Thereafter, DPGM assumed control of IPC's operations and hired all of IPC's sales employees, including Conrad and Gemmill. DPGM did not enter into new employment agreements with Conrad or Gemmill, nor did it modify orally or in writing the employment agreements they had signed with IPC. In 2001, DPGM fully integrated all of the companies it had acquired, both within the United States and in twenty-five countries around the world.

As managers for DPGM, Conrad and Gemmill continued to solicit and service customers in Maryland, Virginia, and Washington, D.C. DPGM spends considerable time training its sales managers to ensure success in bringing in new customers and serving the needs of existing customers. As part of this training, and in connection with their field work, DPGM sales managers have access to highly sensitive and proprietary data concerning pricing, volume, customer contacts, and global business strategies for selling DPGM's services to customers. Managers also have the authority to set rates and determine profit margins. Thus, they have incentive, and are encouraged by DPGM, to develop close business relationships with their customers.

After the merger of IPC and DPGM, Conrad and Gemmill felt that their employment conditions and working environment deteriorated. The number of sales representatives in Maryland, Virginia, and Washington, D.C. increased from three under IPC to eight under DPGM, decreasing the number of potential customers for each representative. Moreover, unlike IPC, DPGM did not allow its representatives to solicit customers outside their assigned territory without a special exception. In 2001, DPWN acquired DHL Worldwide. While DPGM and DHL operated separately, DHL representatives sold international mail services under the DPGM brand, and DPGM prohibited its own representatives from soliciting customers of DHL. Another consequence of the DHL purchase was that five additional sales representatives began to work in the Maryland, Virginia, and Washington, D.C. territory.

Finally, in 2001, DPGM announced that it was instituting a new commission plan and formula for sales representatives. Conrad and Gemmill were asked to sign it, but were also told their compensation would be reduced if they did. (Conrad Dep., at 76–81; Gemmill Dep., at 166–67, 173). They claim that despite their requests, they were never provided with a clear explanation of the new plan and a comparison of the two plans. (Gemmill Dep., at 169–170, 172). As a result, they never signed the new plan and continued to be paid according to their original agreements with IPC. Nevertheless, Conrad and Gemmill received substantial increases in their compensation as a result of DPGM's acquisition of IPC. Conrad's salary went from $54,000 in 1999, while still at IPC, to somewhere between $120,000 and $135,000 in 2001 under DPGM. (Conrad Dep., at 47, 49). Gemmill's salary went from less than $60,000 in 1999 to $126,000 in 2001. (Gemmill Dep., at 18, 20–21).

Concerned with the perceived negative changes, Conrad and Gemmill began to consider leaving DPGM in early 2002. In February 2002, they decided to form their own international mail business. Conrad chose the name Postal Logistics International and reserved a domain on the internet for it. However, in order to conceal PLI from DPGM, Conrad and Gemmill created a corporation called "Benson Mill Communication" and registered it in Maryland. The corporate name was later changed to PLI. At no point during their employment with DPGM did Conrad or Gemmill solicit any customers of DPGM for PLI.

In March 2002, Conrad and Gemmill met with the president and CEO of DPGM, Harry Geller, and told him they were resigning and setting up their own international mail business that would compete with DPGM. Geller said that soliciting any DPGM customers would violate the restrictive covenants in their employment contracts, but Gemmill claimed those agreements were unenforceable. Gemmill then made a proposal whereby PLI would only solicit six to eight of DPGM's biggest customers and would stay away from DPGM's other customers for six months if DPGM would forego enforcing the employment agreements. Geller declined this proposal. Conrad and Gemmill then returned all DPGM documents and officially resigned.

Within hours of resigning, Conrad and Gemmill had its first contact with a DPGM customer, and within days PLI was providing services to DPGM customers. From PLI's inception through April 7, 2003, PLI generated $1,316,560 in revenue, of which $1,165,295 was derived from former DPGM customers. (Defs.' Mem. in support of Motion for Summ. Judg., at 14, Ex. B6). In fact, 38 of PLI's 56 customers, and nearly all of its large customers, are former DPGM customers. (Pl.'s Mem. in support of Cross–Motion for Summ. Judg., at 5–7). Conrad admits that he solicited nearly all of his former DPGM customers on behalf of PLI. (Conrad Dep., at 138–49). During this time, DPGM repeatedly warned Conrad and Gemmill that it would take steps to enforce the restrictive covenants. Notwithstanding these warnings, PLI continued to solicit DPGM customers, and Conrad and Gemmill have stated that they will continue to do so unless and until this court enjoins them from doing so. (Conrad Dep., at 205–05; Gemmill Dep., at 223). DPGM finally instituted suit against Defendants in March 2003, a year after Conrad and Gemmill resigned and began soliciting DPGM customers.

DPGM is currently the largest international mail business in the United States and possesses roughly 30% of the international mail market share. (Geller Dep., at 159). In the Maryland, Virginia, and

Washington, D.C. area, 75% of all international mail customers are clients of DPGM. (Pre. Inj. Hearing Trans., at 25). In 2002, DPGM had revenues of $200 million. (Geller Dep., at 156). By contrast, PLI has only a .2% share of the market and has generated only .6% of the revenues of DPGM. (Defs.' Mem. in support of Mot. for Summ. Judg., at 16, Ex. B6).

## II.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The materiality requirement means that only those factual disputes that might affect the outcome of the suit preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order for there to be a "genuine" issue of material fact, the evidence must be such that a reasonable jury could return a verdict for the non-moving party. *Id.* If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505. In

making a summary judgment determination, the court must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion, so long as those inferences are reasonable and do not amount to speculation or conjecture. *Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995).

The material facts in this case are entirely undisputed. Conrad and Gemmill do not attempt to argue that they did not agree to their employment contracts or that they did not breach those contracts by forming PLI and soliciting customers of DPGM. Rather, they claim that the restrictive covenants are unenforceable.[2] Thus, the issues are ripe for consideration on summary judgment.

## III.

Under Maryland law, a restrictive covenant will be upheld "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Silver v. Goldberger,* 231 Md. 1, 7, 188 A.2d 155, 158 (1963). *See also Gill v. Computer*

**2.** Defendants also contend that because of the significant impact that IPC's merger with DPGM had upon the restrictive covenants, e.g., substantially increasing the customers whom they were prohibited from soliciting in the event that they left DPGM's employ, the merger constituted a modification of their employment agreement that voided their obligation under the restrictive covenants. They further contend that the restrictive covenants were not effectively assigned from IPC to DPGM. I need not decide the issues raised by these contentions in light of my holding that the restrictive covenants are overly broad in scope and cannot be saved by "blue penciling."

I note, however, that even if Defendants' modification argument is without merit, the

fact that Defendants signed their employment agreements with IPC, a much smaller company than DPGM, is pertinent both as to the hardship imposed upon Defendants and the alleged need to protect DPGM's interests. A similar situation existed in *Wallace Butts Insurance Agency, Inc. v. Runge,* [68 N.C.App. 196,] 314 S.E.2d 293, 296 (N.C.App.1984). There, the employer had merged with another company, and the successor company operated in much greater areas than the predecessor company that had originally hired the defendant. The court held that the merger limited the area and opportunity for employment by the defendant unreasonably because the employee could never have suspected the employer to expand to such territories. *Id.*

*Equipment Corp.*, 266 Md. 170, 180, 292 A.2d 54, 59 (1972); *Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118, 123–24, 225 A.2d 288, 291 (1967); *MacIntosh v. Brunswick Corp.*, 241 Md. 24, 31, 215 A.2d 222, 225 (1965).

DPGM is now only seeking to enforce a very narrow portion of the restrictive covenants—specifically, that part of section 5(a)(ii) prohibiting the direct or indirect solicitation or diversion of DPGM customers, as well as attempted solicitation or diversion. (Pl.'s Mem. in support of Cross–Motion for Summ. Judg., at 19). Defendants argue that even this single restriction is unreasonable in scope (as to activities, duration, and geography), that it is unnecessary to protect DPGM's business, that it imposes an undue hardship on Conrad and Gemmill, and that it is contrary to the public interest. DPGM claims that the covenants are not unreasonable as written, but that even if they are, the court can edit them to make them reasonable.

■ Before determining if the restriction on solicitation of customers is reasonable, I must address the preliminary question of a court's ability to limit a covenant to only one of its sections. Maryland law does permit courts to "blue pencil," or excise language from restrictive covenants that is unnecessarily broad. *See, e.g., Tawney v. Mutual System of Maryland, Inc.*, 186 Md. 508, 521, 47 A.2d 372, 379 (1946); *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 465–66, 598 A.2d 794, 802 (1991). Traditionally, such editing has been limited to removing the offending language without supplementing or rearranging the remaining language. *Fowler*, 89 Md.App. at 465–66, 598 A.2d at 794.

Here, in order to enforce the non-solicitation of customers provision in Conrad and Gemmill's restrictive covenants, I would only have to make two modifications: strike out section 5(a)(iii) completely and strike out a substantial portion of section 5(a)(ii). The latter section, which prohibits engaging in any activity that may adversely affect DPGM, would be eliminated, as well as the references in that section to "any Related Corporation." It currently reads:

> Engage in any activity which may affect adversely the interests of the Company or any Related Corporation and the businesses conducted by either of them, including, without limitation, directly or indirectly soliciting or diverting customers and/or employees of the Company or any Related Corporation or attempting to so solicit or divert such customers and/or employees.

Were I to blue pencil this language, the edited version of section 5(a)(ii) would simply read, "Engage in soliciting or diverting customers of the Company or attempting to so solicit or divert such customers."

Although I have substantial doubts about the wisdom of any blue pencil rule,[3] removing section 5(a)(iii) and the offending language from 5(a)(ii) would not involve any rewriting or reorganizing of the remaining language. Therefore, it would be in line with what Maryland courts have traditionally done under the blue pencil rule. *See Tawney*, 186 Md. at 521, 47 A.2d at 379; *Hebb v. Stump, Harvey & Cook*, 25 Md.App. 478, 491, 334 A.2d 563, 571 (1975); *United Rentals v. Davison*, 2002 WL 31994250, at *5 (Md.Cir.Ct. July 23, 2002).

**3.** In my view to permit blue penciling encourages an employer to impose an overly broad restrictive covenant, knowing that if the covenant is challenged by an employee the only consequence suffered by the employer will be to have a court write a narrower restriction for it. This appears to me to be extremely unfair and contrary to sound public policy. *Cf. Trailer Leasing Co. v. Associates Commercial Corp.*, 1996 WL 392135, at *4 (N.D.Ill. July 10, 1996); *Telxon Corp. v. Hoffman*, 720 F.Supp. 657, 666 (N.D.Ill.1989).

## IV.

### A.

■ Having found that it is permissible for DPGM to seek enforcement of only the non-solicitation of customers provision of the restrictive covenants, the next question for me to decide is whether the selected portion of the covenants is reasonable. Unquestionably, DPGM's narrowing of the covenants appears to make them more reasonable. The other portions of the covenants from which DPGM is now backing away are vague and far broader than reasonably necessary to protect DPGM's interests. A mere prohibition on solicitation of customers, however, is commonly found in restrictive covenants and is not inherently unreasonable. *Intelus Corp. v. Barton,* 7 F.Supp.2d 635, 641 (D.Md.1998).

■ Still, the question remains whether the prohibition of solicitation on *all* of DPGM's clients is reasonable, given DPGM's size and presence in the international mail market. Because DPGM has 30% of the market share, the restriction encompasses a very significant number of potential clients for PLI and, if enforced, would impose great hardship on PLI. Moreover, given PLI's small size and market share compared to DPGM's, prohibiting PLI from soliciting any of DPGM's clients is not reasonably necessary to protect DPGM's interests.

It is true that Maryland courts have enforced some restrictive covenants that contained prohibitions on solicitation of all the employer's clients. *See, e.g., Gill,* 266 Md. at 180, 292 A.2d at 59; *Tuttle v. Riggs–Warfield–Roloson, Inc.,* 251 Md. 45, 47, 246 A.2d 588, 589 (1968). However, a court must analyze restrictive covenants in the context of the specific facts of the case. *Ruhl,* 245 Md. at 123, 225 A.2d at 291. For example, in *Gill,* the employee was only barred from servicing customers of the particular division in which he worked, and only those customers who had been

serviced by his employer in the year prior to the termination of his employment. 266 Md. at 180, 292 A.2d at 59. And in *Tuttle,* there was no evidence to suggest that the employer had so many customers that the restriction on solicitation would impose the same hardships that it would in this case. 251 Md. 45, 246 A.2d 588.

Moreover, Maryland courts have recently expressed concerns about the imposition of such blanket restrictions on client solicitation. In *PADCO Advisors, Inc. v. Omdahl,* 179 F.Supp.2d 600, 608 (D.Md.2002), the court stated, "Maryland has looked with disfavor on...agreements which restrict former employees from dealing with all former clients." The *PADCO* court cited to *Holloway v. Faw, Casson & Co.,* 78 Md.App. 205, 225, 552 A.2d 1311, 1321 (1989), *rev'd in part on other grounds,* 319 Md. 324, 572 A.2d 510 (1990), where the Maryland Court of Special Appeals held that the restriction on solicitation of all the former employer's clients was unjustifiable for the purposes of protecting the employer. Because the former employer had six offices in Maryland and Delaware, the employee, who had only worked in one location, would likely not be able to profit from the personal relationships he had forged to solicit clients of the other offices with whom he had no contact. *Id.* at 222, 552 A.2d at 1319.

The situation in *Holloway* is amplified even more in this case, where DPGM's customer base is immense and expands across the globe, and Conrad and Gemmill developed comparatively few customer relationships in the limited area of Maryland, Virginia, and Washington, D.C. While Conrad and Gemmill may have learned DPGM's strategic and pricing information and at one point had access to the master customer list, DPGM does not dispute the fact that they made no copies of any DPGM documents and returned all the

documents they had in their possession upon their resignation. In light of these circumstances, prohibiting Defendants from soliciting all of DPGM's customers restricts more activity than necessary to protect DPGM's interests.

### B.

Defendants also challenge the duration and geographical scope of the covenants. Defendants' restrictive covenants last for two years, and their durational challenge is weakened by the fact that two-year prohibitions on competition and solicitation have routinely been upheld by courts applying Maryland law. *See PADCO Advisors,* 179 F.Supp.2d at 606; *Gill,* 266 Md. at 181, 292 A.2d at 59; *Tuttle,* 251 Md. at 49, 246 A.2d at 590. However, Defendants point out that the restrictive covenants in the agreements that DPGM requires employees whom it hires (rather than employees whom it inherits by acquisition and merger) to sign are for only one year, and that DHL employees have not been required to sign restrictive covenants at all. These facts draw into serious question whether a two-year restriction is necessary to protect DPGM's interests. I need not reach that question, however, in light of my holding that the covenants are otherwise unenforceable.[4]

As for the geographical area, the covenants do not contain any restriction in the portion devoted to solicitation and diversion of customers. Maryland courts have not specifically addressed whether restrictive covenants with no geographical limitations are unenforceable per se. However, federal district courts applying Maryland law have held that in situations where the plaintiff competes for clients on a global

basis, a restriction limited to a narrow geographic area would be meaningless; therefore, the absence of such a restriction is reasonable. *See Intelus,* 7 F.Supp.2d at 641–42; *Hekimian Labs., Inc. v. Domain Sys., Inc.,* 664 F.Supp. 493, 498 (S.D.Fla. 1987) (applying Maryland law).

▆▆▆ That said, *Intelus* and *Hekimian Labs.* are both distinguishable from the present case because the plaintiffs there did not dominate the markets in which they competed. In contrast, DPGM has a roughly 30% share of the international mail market. The next closest competitor is the United States Postal Service, with 19% of the market share. PLI possesses a mere .2% market share. (Defs.' Mem. in support of Mot. for Summ. Judg., at 15–16). This distinction is important in two respects. First, as a matter of broad public policy, restrictive covenants should not be permitted to stifle healthy competition in a market dominated by a single firm. Second, under Maryland law restraints in restrictive covenants must be viewed in the context of the hardship imposed on the employees and the necessity of the restraint to protect the employer's interests. *See Silver,* 231 Md. at 7, 188 A.2d at 158. Here, enforcement of the covenants would impose serious hardship on Defendants and is not necessary for the protection of DPGM's interests.

### V.

▆▆▆ DPGM argues that even if I find the restrictive covenants unenforceable as written, I can edit them to make them reasonable. As discussed above, Maryland law permits courts to remove unnecessari-

---

4. Of course, if I did find that two-year provision to be unreasonable, I would also have to decide whether a shorter provision would be reasonable and if so, whether the Court of Special Appeals decision in *Holloway,* 78 Md. App. at 239, 552 A.2d at 1328—where the court blue penciled a restrictive covenant to shorten its duration—remains good law. On the latter point, for the reasons stated in section V of this opinion, I am inclined to believe that *Holloway* has been discredited by subsequent opinions.

ly broad language from restrictive covenants to make them enforceable, as long as the remaining language need not be reorganized or rewritten. In order to limit the prohibition on customer solicitation to make it reasonable under the circumstances, arguably I could do one of two things. I could narrow the restriction so as to bar solicitation only of those customers with whom Conrad and Gemmill had contact while working for DPGM, or I could narrow the restrictions geographically. However, I do not have to decide whether either of these modification options would be appropriate because both of them would require me to rewrite the restrictive covenants, in conflict with Maryland law.

DPGM suggests that the addition of the words "with whom Conrad and Gemmill had contact" after the words "customers of the Company" in the non-solicitation provision would not be an impermissible rewriting of the contract. (Pl.'s Mem. in support of Cross–Motion for Summ. Judg., at 26). DPGM cites the decision of the Court of Special Appeals in *Holloway*, 78 Md.App. at 238, 552 A.2d at 1327–28, in which the court employed a flexible approach to blue penciling. The *Holloway* court explained that two views of blue penciling have emerged among courts and commentators. The first is the "strict divisibility" view: "if the [covenant] is so worded that the excessive restraint can be eliminated by crossing out a few of the words with a 'blue pencil,' while at the same time the remaining words constitute a complete and valid contract, the contract as thus 'blue penciled' will be enforced." *Id.* at 233, 552 A.2d at 1325. This is the view traditionally followed by Maryland courts, and is the one I earlier employed in deciding that the covenants could be narrowed to a restriction prohibiting customer solicitation.

The second is a more liberal approach in which strict divisibility is not required.

Rather a restraint is enforced "to the extent that it is reasonable and lawful, the test being whether partial enforcement is possible without injury to the public and without injustice to the parties." *Id.* at 235, 552 A.2d at 1326. The *Holloway* court devised a two-part inquiry. First, a court is to determine if the covenant as a whole shows a deliberate intent by the employer to place unreasonable and oppressive restraints on the employee, in which case the entire covenant is invalidated. *Id.* at 238, 552 A.2d at 1327. Second, if the covenant survives the first question but the covenant is still unreasonable, the court is to modify the terms so as to align the reasonable expectations of the parties to the reasonable expectations of the law. *Id.* The *Holloway* court used this approach to affirm the trial court's decision to strike out the portion of the restrictive covenant prohibiting competition for five years and replace it with a three-year restriction instead. *Id.* at 239, 552 A.2d at 1328.

■ No Maryland case since *Holloway* has applied the flexible approach endorsed by that court. When *Holloway* was appealed, the Maryland Court of Appeals affirmed in part and reversed in part on other grounds, but expressly refused to address whether the flexible approach applied by the Court of Special Appeals was part of Maryland law. *Holloway*, 319 Md. at 326–27, 572 A.2d at 511. Moreover, in *Fowler*, 89 Md.App. at 465–66, 598 A.2d at 802, when confronted with the blue pencil issue, the court confirmed the strict divisibility approach as "entirely in accord with Maryland law." These pronouncements, combined with the traditional use of the strict divisibility rule by Maryland courts prior to the *Holloway* decision, *see Tawney*, 186 Md. at 521, 47 A.2d at 379; *Hebb*, 25 Md.App. at 491, 334 A.2d at 571, persuade me that blue penciling must be limited to the removal of offending language

and cannot include the addition of words or phrases in an effort to make the restrictive covenant reasonable. This decision was also reached by a Maryland circuit court addressing this issue in *United Rentals v. Davison*, 2002 WL 31994250, at *5. In that case, after determining that Maryland likely utilizes a strict divisibility approach, the court struck down a two-year restriction on customer solicitation as overly broad, and because there was no remaining language in that portion of the covenant providing a suitable time duration, held the entire section to be unenforceable. *Id.*

In the present case, the strict divisibility approach permits me to strike section 5(a)(iii) of Conrad and Gemmill's restrictive covenants and the overbroad portions of section 5(a)(ii), as described in Section III *supra*. However, it does not allow me to add words limiting the solicitation provision so as to apply only to those customers that Conrad and Gemmill had contact with, or alternatively, to customers within the United States. Accordingly, Defendants are entitled to the summary judgment they seek.

A separate order is being entered therewith.

## ORDER

For the reasons stated in the accompanying opinion, it is, this 14th day of November 2003

ORDERED

1. Plaintiff's motion for partial summary judgment is denied;

2. Defendants' motion for summary judgment is granted; and

3. Judgment is entered in favor of defendants against plaintiff.